112 F.3d 652
 44 ERC 1481, 65 USLW 2749, 27 Envtl.
L. Rep. 21,099
 ATLANTIC COAST DEMOLITION & RECYCLING, INC., Plaintiff,
v.
BOARD OF CHOSEN FREEHOLDERS OF ATLANTIC COUNTY; Atlantic
County Utilities Authority; Board of Chosen Freeholders of
Camden County; Pollution Control Financing Authority of
Camden County; Scott A. Weiner, Individually and in his
capacity as Commissioner of New Jersey Department of
Environmental Protection and Energy, Defendants,
Mercer County Improvement Authority; Hudson County
Improvement Authority; Essex County Utilities Authority;
Passaic County Utilities Authority; Cape May County
Municipal Utilities Authority; Camden County Energy
Recovery Associates, L.P., Intervenor-Defendants
C & A CARBONE, INC.; Bret Schundler, Mayor, in his capacity
as Mayor of city of Jersey City; John Rooney, Mayor, in his
capacity as Mayor of Borough of Northvale; National Solid
Waste Management Association, New Jersey Chapter; Waste
Management Association of New Jersey; City of Passaic;
City of Paterson; Dwight Destefan, Mayor, Individually and
in his capacity as Mayor of the Township of River Vale, Plaintiffs,
v.
Robert C. SHINN, Jr., Individually and in his capacity as
Commissioner of New Jersey Department of Environmental
Protection and Energy; New Jersey Department of
Environmental Protection and Energy; Larry J. McClure,
Individually and in his official capacity as Executive
Director of the Bergen County Utilities Authority; Bergen
County Utilities Authority; Mark Guarino, Individually and
in his official capacity as Director of the Bergen County
Health Department; Bergen County Health Department;
Kenneth Blane, Individually and in his official capacity as
Executive Director of the Hudson County Improvement
Authority; Hudson County Improvement Authority; Carol Ann
Wilson, Individually and in her official capacity as
Director of the Hudson County Health Department; William P.
Schuber, Individually and in his official capacity as County
Executive for Bergen County; Robert C. Janiszewski,
Individually and in his official capacity as County
Executive for Hudson County; Passaic County Utilities
Authority; Anthony Ross, Individually and in his capacity
as Executive Director; Nicola R. Didonna, Individually and
in his capacity as County Executive for the County of Passaic.
National Solid Wastes Management Association; Waste
Management Association of New Jersey; and C & A
Carbone, Appellants in 96-5567.
New Jersey Department of Environmental Protection; Scott A.
Weiner; and Robert C. Shinn, Jr., Commissioner,
Appellants in 96-5568.
Cape May County Municipal Utilities Authority ("CMCMUA"),
Appellants in 96-5569.
Essex County Utilities Authority; Hudson County Improvement
Authority; Mercer County Improvement Authority;
and Passaic County Utilities Authority,
Appellants in 96-5570.
 Nos. 96-5567 to 96-5570.
 United States Court of Appeals,
Third Circuit.
 Argued Dec. 17, 1996.
Decided May 1, 1997.
 
 Mark R. Rosen (argued), Mesirov, Gelman, Jaffe, Cramer & Jamieson, Haddonfield, New Jersey, for Appellee Atlantic Coast Demolition & Recycling, Inc.
 Betty J. Christian (argued), Paul J. Ondrasik, Jr., William T. Hassler, David A. Stein, Steptoe & Johnson, L.L.P., Washington, D.C., and Joseph Torre, Torre & Torre, Hasbrouck Heights, New Jersey, for Appellants National Solid Wastes Management Association; C & A Carbone, Inc; and Waste Management Association of New Jersey.
 Peter Verniero, Attorney General of New Jersey, Division of Law, Trenton, New Jersey, Andrea M. Silkowitz, Assistant Attorney General, Gail M. Lambert (argued), and Stefanie A. Brand, Deputy Attorneys General of New Jersey, Newark, New Jersey, for Appellees Robert C. Shinn, Jr.; Scott Weiner, Individually and in his capacity as Commissioner of New Jersey Department of Environmental Protection and Energy, and New Jersey Department of Environmental Protection.
 Barbara H. Parker, Office of County Counsel, Hackensack, New Jersey, for Appellees Mark Guarino, Individually and in his official capacity as Director of the Bergen County Health Department, and William P. Schuber, Individually and in his official capacity as County Executive for Bergen County.
 Thomas S. Higgins, Higgins, Long & Bonfiglio, Laurel Springs, New Jersey, for Appellee Cape May County Municipal Utilities Authority.
 J. Sheldon Cohen (argued), DeCotiis, Fitzpatrick & Gluck, Teaneck, New Jersey, for Appellants Essex County Utilities Authority; Hudson County Improvement Authority; Mercer County Improvement Authority and Passaic County Utilities Authority.
 Stephen P. Sinisi (argued) and Scott G. Sproviero, Sinisi, Van Dam, Spoviero & Sokolich, Paramus, New Jersey, for Appellee Bergen County Utilities Authority.
 Gage Andretta and David J. Sprong, Wolff & Samson, Roseland, New Jersey, for Amicus Curiae, Camden County Energy Recovery Associates, L.P.
 Before: STAPLETON, ROTH and GARTH, Circuit Judges
 OPINION OF THE COURT
 ROTH, Circuit Judge.
 
 
 1
 This case comes before us a second time for a determination whether New Jersey's regulation of the disposal of solid waste is constitutional under the Commerce Clause of the Constitution. New Jersey's "flow control" statutes require waste management districts to contract with designated waste facilities for the disposal of locally generated waste. Following the Supreme Court's decision in C & A Carbone, Inc. v. Town of Clarkstown, 511 U.S. 383, 114 S.Ct. 1677, 128 L.Ed.2d 399 (1994), we held that these laws discriminated against interstate commerce in purpose and effect by disfavoring out-of-state facilities and inhibiting the export of solid waste from New Jersey. Atlantic Coast Demolition & Recycling, Inc. v. Board of Chosen Freeholders of Atlantic Cty., 48 F.3d 701, 712-13 (3d Cir.1995)("Atlantic Coast I" ). We then remanded the case to the district court to determine whether the flow control laws could meet heightened scrutiny under the "dormant" Commerce Clause.[1] Id. at 717-18.
 
 
 2
 After hearing extensive evidence, the district court concluded that New Jersey had not met its burden of demonstrating that it lacked alternate means of achieving its legitimate interest in creating a safe and effective system for in-state solid waste disposal. Atlantic Coast Demolition & Recycling, Inc. v. Board of Chosen Freeholders of Atlantic Cty., 931 F.Supp. 341, 359 (D.N.J.1996). Upon finding New Jersey's flow control laws unconstitutional, the district court granted a permanent injunction both to plaintiffs who process and dispose of construction and demolition waste (so-called "C & D" waste), and to plaintiffs who process other types of solid waste.[2] The district court then issued a two-year post-appeal stay on the permanent injunction, except as it applied to processors of C & D waste. Id.
 
 
 3
 The Carbone plaintiffs and the defendants have appealed the district court's decision. We will affirm the district court's findings that New Jersey's flow control laws and regulations are unconstitutional insofar as they discriminate against out-of-state waste processing facilities. We will not, however, affirm the lower court's post-appeal stay because the record cannot support the district court's exercise of "equitable discretion" to delay the enjoining of an admittedly unconstitutional regulatory system.
 
 
 4
 The district court had jurisdiction over this case pursuant to 28 U.S.C. § 1331. We have jurisdiction under 28 U.S.C. § 1291.
 
 I. FACTS
 
 5
 As this nation's prosperity and consumption have increased over the years, so too has its solid waste. The processing and placement of garbage pose substantial economic and environmental concerns. In the past, states have attempted to meet those concerns by limiting or banning the importation of solid waste. The Supreme Court, however, has struck down these laws as unconstitutional because they discriminate against interstate commerce and thereby invoke heightened or rigorous scrutiny under the dormant component of the Commerce Clause. See City of Philadelphia v. New Jersey, 437 U.S. 617, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978); Fort Gratiot Landfill v. Michigan Dep't of Natural Resources, 504 U.S. 353, 112 S.Ct. 2019, 119 L.Ed.2d 139 (1992).
 
 
 6
 More recently, states and municipalities have erected barriers to the exportation of solid waste in the hope that in-state control of solid waste facilities will protect their communities from environmental harm, as well as guarantee a certain level of business for in-state processors. See Phillip Weinberg, Congress, the Courts, and Solid Waste Transport: Good Fences Don't Always Make Good Neighbors, 25 Envtl.L. 57 (1995). Like the previous bans on importation of solid waste, the locally enacted barriers against the exportation of solid waste implicate the dormant Commerce Clause because they raise concerns about state protectionism and "balkanization." Garbage, however unpleasant or unwanted, carries substantial value for those with the desire or know-how to dispose of it. In Carbone, the Supreme Court held that laws limiting the export of solid waste may be subject to heightened scrutiny because "[t]he Commerce Clause presumes a national market free from local legislation that discriminates in favor of local interests." Carbone, 511 U.S. at 393, 114 S.Ct. at 1683 (striking down local ordinance requiring all solid waste to be processed through local transfer station).
 
 
 7
 The law challenged in this case falls into the second category of waste-control laws because it places barriers on the exportation of solid waste.
 
 
 8
 A. New Jersey's Regulation of the Disposal of Solid Waste
 
 
 9
 This Court has described New Jersey's comprehensive solid waste disposal system in detail in Atlantic Coast I, 48 F.3d at 704-708. We will provide a brief review of that system as it impacts this case.
 
 
 10
 In response to a waste disposal crisis, New Jersey enacted the Solid Waste Management Act ("SWMA"), N.J.S.A. §§ 13:1E-1 et seq., and the Solid Waste Utility Control Act ("SWUCA"), N.J.S.A. §§ 48:13A-1 et seq. in 1970 to provide a safe, comprehensive and effective means of solid waste disposal within the state. These statutes strictly control the collection, transportation and processing of solid waste generated within the state, thus earning the appellation "flow control laws." Under these laws, any waste disposal facility, regardless of its ownership or location, must clear two substantial hurdles before it disposes of solid waste generated within New Jersey. First, the facility must obtain a contract with one of New Jersey's twenty-two waste management districts. Unless a facility has been designated by a waste management district, that facility cannot dispose of locally generated waste. Second, even if the facility contracts with a district for service, the waste disposal facility must obtain the approval of the State's Department of Environmental Protection (hereinafter "the State" or NJDEP). Under this regime, out-of-state facilities have rarely been authorized to dispose of New Jersey's solid waste.[3]
 
 
 11
 Under SWMA, New Jersey is divided into twenty-two solid waste management districts, which include the State's twenty-one counties and the Hackensack-Meadowlands District. N.J.S.A. § 13:1E-19. The districts have formulated long-term solid waste disposal plans in accordance with the State's laws and regulations. N.J.S.A. § 13:1E-20. These plans have had to meet NJDEP's approval. See N.J.S.A. § 13:1E-24. Management districts have chosen between delegating their waste disposal responsibilities to designated municipal authorities within the district or exercising direct control over waste disposal themselves.[4] Municipal authorities and districts in turn have met the State's waste disposal obligations by contracting with or operating their own waste disposal and recycling facilities.
 
 
 12
 Pursuant to the flow control laws, several waste disposal authorities have assumed substantial debt obligations to build waste disposal facilities "to assure the safe and efficient disposal of solid waste generated in their districts." Atlantic Coast II, 931 F.Supp. at 347 p 5. The district court found that "[t]he solid waste public debt outstanding in New Jersey as of December 31, 1994, was $1.65 billion, which is the total of 53 separate bonds issued by New Jersey local authorities or counties." Id., at 348 p 12. Currently, the disposal facilities service their debt by charging "tipping fees" for disposing of waste.[5] The fees charged by the designated facilities are significantly higher than the fees charged by their out-of-state counterparts. Id., at 349 p 17.[6]
 
 
 13
 Once an authority has chosen a particular private or public entity to service its waste disposal needs, that entity must seek approval from NJDEP (through registration and issuance of a permit) prior to commencing service. N.J.S.A. § 13:1E-5. A facility cannot obtain a permit unless it is designated by the municipal district or authority in its waste disposal plan. N.J.S.A. § 13:1E-4(b). Regional Recycling, Inc. v. State Dep't of Environmental Protection, 256 N.J.Super. 94, 606 A.2d 817 (App.Div.1991). All waste generated within the state must be directed to the processing facility designated by the district or municipal authority. See N.J.S.A. § 48:13A-4(c). The designation of the particular facility for waste disposal in each waste management district is codified in NJDEP regulations. N.J.Admin.Code tit. 7, § 7:26-6.5 (Supp.1996).
 
 
 14
 Although a waste management district or authority may contract with an out-of-state facility for waste disposal, NJDEP's policy of attaining self-sufficiency has favored operators that have facilities within the state or that are willing to construct a facility there. See Atlantic Coast I, 48 F.3d at 707-708. Waste management districts desiring to enter into agreements with out-of-state facilities have had to certify to NJDEP that no other sites within the district meet the district's waste disposal needs. N.J.S.A. § 13:1E-21(b)(3). The certification provision on its face does not appear to prohibit out-of-state solid waste facility operators from competing for an agreement to process a district's waste.[7] Nevertheless, the certified processors for each district, presently listed in N.J.A.C. § 7:26-6.5, have been chosen under the NJDEP policy of reducing dependence on facilities outside the state for waste disposal services. See Atlantic Coast I, 48 F.3d at 707 (discussing NJDEP's self-sufficiency policy). As the district court stated at the first Atlantic Coast trial: "Although it is not the subject of a clear legislative direction [sic], it is equally clear that [NJDEP] administers the law with the specific goal that all waste generated in New Jersey be disposed of within the borders of the state." Atlantic Coast I, 48 F.3d at 707 (quoting district court) ( [sic] in original). The imposition of this self-sufficiency policy on the selection of waste disposal facilities has resulted in the discrimination against out-of-state processors which we found in Atlantic Coast I.
 
 
 15
 Under the present flow control system, those who violate New Jersey law by disposing of solid waste at facilities not designated in N.J.A.C. § 7:26-6.5 risk the imposition of significant penalties. Section 13:1E-9 of the SWMA authorizes NJDEP's commissioner to take various civil and administrative actions against those who violate any provision of P.L.1970, c. 39 (the SWMA), or any code, rule or regulation adopted pursuant to that law. In addition, Section 13:1E-9(e) authorizes civil penalties totaling as much as $50,000 for each violation of the solid waste laws "provided that each day during which the violation continues shall constitute an additional, separate and distinct offense." N.J.S.A. § 13:1E-9(e). The State has employed this provision to penalize undesignated waste disposal facilities and enjoin them from engaging in the unauthorized collection and disposal of solid waste generated within the state. See e.g. State, Dep't of Environmental Protection v. Interstate Recycling, Inc., 267 N.J.Super. 574, 632 A.2d 526 (App.Div.1993) (NJDEP may pursue injunction against unlicensed waste disposal facility).[8]
 
 
 16
 Other provisions enforcing the requirement that waste disposal facilities be designated under N.J.A.C. § 7:26-6.5 include Section 13:1E-9.4 of SWMA, which authorizes civil forfeiture of all conveyances used or intended for use in the transport or unlawful disposal of solid waste. N.J.S.A. § 13:1E-9.4(d). In addition, persons who collect, dispose of or transport solid waste to undesignated sites subject themselves individually to civil fines of up to $10,000 for each day of violation. N.J.S.A. § 13:1E-9.4. Finally, an individual who engages in the unauthorized collection, transport or disposal of solid waste is guilty of a crime in the fourth degree, which carries with it the penalty of up to 18 months in prison. N.J.S.A. § 48:13A-12(a).
 
 
 17
 Taken as a whole, the waste disposal laws present substantial barriers to out-of-state firms wishing to collect, transport and process any of the waste generated within New Jersey. The State is able to enforce this regulatory system through its impressive array of rules, regulations, fines and other penalties.
 
 B. Procedural History
 
 18
 The procedural history of this case is well documented by the district court in Atlantic Coast II, 931 F.Supp. at 343. Atlantic Coast, a Pennsylvania corporation operating a transfer station and recycling center for construction and demolition (C & D) debris, began this action on June 23, 1993, when it filed a complaint under 42 U.S.C. § 1983 against the Commissioner of NJDEP, seeking a declaratory judgment that the codification of waste disposal designations at N.J.A.C. § 7:26-6.5 violated the Commerce Clause and seeking a permanent injunction against the enforcement of this regulation.[9] Atlantic Coast also promptly moved for a preliminary injunction.
 
 
 19
 On September 8, 1993, the district court denied Atlantic Coast's motion and found in favor of NJDEP. Atlantic Coast Demolition & Recycling, Inc. v. Board of Chosen Freeholders, 1993 U.S. Dist. Lexis 20,810 (D.N.J. Sept. 8, 1993). In doing so, the court followed our decision in J. Filiberto Sanitation, Inc. v. New Jersey Dep't of Envtl. Protection, 857 F.2d 913 (3d Cir.1988), and analyzed New Jersey's waste disposal system under the balancing test enunciated by the Supreme Court in Pike v. Bruce Church, Inc., 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970), rather than under the more rigorous test set forth in Maine v. Taylor, 477 U.S. 131, 138, 106 S.Ct. 2440, 2447, 91 L.Ed.2d 110 (1986). Under the Pike test, a statute that burdens interstate commerce will be upheld unless that burden "is clearly excessive in relation to the putative local benefits." Pike, 397 U.S. at 142, 90 S.Ct. at 847. By contrast, the Maine test holds that statutes that discriminate against interstate commerce are unconstitutional unless the State can demonstrate that it has no other way of achieving a legitimate interest. The district court concluded that the benefits of the State's waste disposal system outweighed the burden placed on out-of-state facilities like Atlantic Coast, and on February 24, 1994, it entered final judgment in favor of defendants. Atlantic Coast appealed.
 
 
 20
 While Atlantic Coast's appeal was pending, the Supreme Court rendered its decision in C & A Carbone, Inc. v. Town of Clarkstown, 511 U.S. 383, 114 S.Ct. 1677, 128 L.Ed.2d 399 (1994). In Carbone, the Court concluded that the town of Clarkstown's local waste control ordinance--somewhat similar to the waste control regulations in New Jersey--discriminated against interstate commerce and therefore triggered strict scrutiny under the dormant Commerce Clause. The Court then held that Clarkstown had not met this level of heightened scrutiny. Carbone, 511 U.S. at 393-94, 114 S.Ct. at 1684.
 
 
 21
 This Circuit then applied the principles set forth by the Supreme Court in Carboneto Atlantic Coast's appeal and concluded that New Jersey's waste control laws discriminated--in purpose and practical effect--against interstate commerce. See Atlantic Coast I, 48 F.3d at 712. We remanded the case to the district court to allow it to apply the correct test under the dormant Commerce Clause. We also provided that Atlantic Coast could re-apply for injunctive relief since the district court's prior decision "was based primarily on its conclusion that Atlantic Coast had failed to demonstrate a likelihood of success on the merits of its challenge." Atlantic Coast I, 48 F.3d at 718. Since the applicable test entailed heightened scrutiny as defined by Maine v. Taylor, "the likelihood of success issue is a materially different one from that which the district court previously addressed." Id.
 
 
 22
 Atlantic Coast filed a new motion for a preliminary injunction on April 11, 1995. At the same time, the district court permitted several County Authorities to intervene as defendants.[10] In the meantime, on July 11, 1994, C & A Carbone Inc., a New York waste disposal facility, along with the Waste Management Association of New Jersey and the National Solid Wastes Management Association, had filed an action against NJDEP seeking declaratory and injunctive relief, as well as damages.[11] Unlike Atlantic Coast, Carbone processes all types of solid waste, not just C & D waste.[12] Carbone's case was stayed pending this Court's decision in Atlantic Coast I. Following our remand of Atlantic Coast I, the two cases were consolidated. At the request of the parties, the district court re-opened the record and extensive discovery ensued. Carbone joined Atlantic Coast in its motion for a preliminary injunction.
 
 
 23
 On June 9, 1995, the district court conditionally granted Atlantic Coast's motion for a preliminary injunction as to C & D waste but denied Carbone's, based on the court's analysis of various equitable considerations. Atlantic Coast Demolition & Recycling, Inc. v. Board of Chosen Freeholders, 893 F.Supp. 301 (D.N.J.1995).[13] The Carbone plaintiffs did not appeal this decision. The parties then conducted additional discovery.
 
 
 24
 Finally, on July 15, 1996, the district court issued a permanent injunction in favor of the plaintiffs, concluding that the defendants had failed to uphold their burden of demonstrating under the heightened scrutiny test of the dormant Commerce Clause that they lacked alternate means of achieving their solid waste disposal program. Atlantic Coast Demolition & Recycling, Inc. v. Board of Chosen Freeholders, 931 F.Supp. 341 (D.N.J.1996) (hereinafter Atlantic Coast II ). In entering final judgment in favor of the plaintiffs, the district court observed that "defendants have not even attempted to present a feasible nondiscriminatory alternative to the Court, but have merely caricatured each of the tools that may be used in building a new system." Atlantic Coast II, 931 F.Supp. at 351. However, although the court granted the Carbone plaintiffs a permanent injunction, it stayed that injunction for a period of "two years following the date on which this case is no longer subject to a right of appeal, or is no longer pending on appeal or on Petition for [Certiorari] to the United States Supreme Court." Id. at 358. The stay did not apply to the Atlantic Coast plaintiffs, who collect and dispose only of C & D waste.
 
 
 25
 Shortly thereafter, in an unrelated proceeding, Waste Management of Pennsylvania, Inc. v. Shinn, 938 F.Supp. 1243 (D.N.J.1996), a New Jersey district court found that the State's policy of ensuring self-sufficient waste disposal "discriminates against out-of-state waste disposal facilities in favor of in-state economic interests without serving any legitimate local interest which could not be addressed by less restrictive means." Waste Management, 938 F.Supp. at 1256. Accordingly, the district court enjoined the State from taking any action to "preclude the use of out-of-state waste disposal facilities solely because said facilities are located outside of New Jersey." Waste Management, 938 F.Supp. at 1263. At the request of the State, the district court then modified the injunction as follows:
 
 
 26
 ORDERED that the Commissioner of the Department of Environmental Protection is permanently enjoined from implementing New Jersey's self-sufficiency policy as mandated under the State Plan to abrogate existing valid contracts or to reject or foreshorten contracts submitted to the New Jersey Department of Environmental Protection for review.
 
 
 27
 Waste Management of Pennsylvania, Inc. v. Shinn, No. 94-1983 (D.N.J. October 29, 1996).[14]
 
 
 28
 This injunction recognizes the conclusion that we reached in Atlantic Coast I that New Jersey's flow control laws discriminate against interstate commerce. By enjoining the State's future implementation of its self-sufficiency policy, the modified injunction removes only one of the barriers to New Jersey's waste disposal market for out-of-state waste disposal facilities. The injunction does not undo the twenty-two waste management district's plans for waste disposal. Neither does the Waste Management injunction affect N.J.A.C. § 7:26-6.5, which codifies the twenty two districts' designations of proper facilities for waste disposal. The Carbone plaintiffs therefore remain excluded from New Jersey's waste disposal market.
 
 II. THE APPEAL
 
 29
 The County Authority defendants appeal the district court's decision on the ground that the district court should not have applied heightened scrutiny to the waste flow regulations. The State appeals the district court's decision on the ground that, even if heightened scrutiny was warranted, the State established at trial that it had no other means by which to achieve its legitimate interests in guaranteeing safe and effective solid waste disposal and protecting the financial integrity of the local entities which depend on flow control laws for operating revenues and debt service. Finally, the Carbone plaintiffs appeal the district court's stay as unconstitutional.
 
 
 30
 We shall examine each of these arguments in turn.
 
 A. Choosing the Proper Test
 
 31
 We first review the district court's application of the heightened scrutiny test to New Jersey's flow control laws. According to the County Authorities, the district court applied an inappropriate level of scrutiny on remand. The County Authorities also argue that the district court should have "severed" the State's policy of ensuring self-sufficient waste disposal from the rest of New Jersey's flow control statutes and then analyzed the twenty-two district waste disposal plans separately, on a district by district basis. These arguments lack merit, as they ignore our earlier decision in Atlantic Coast I.
 
 
 32
 A statute triggers heightened scrutiny under the dormant Commerce Clause whenever that statute has a discriminatory purpose or effect on interstate commerce. See Harvey & Harvey, Inc. v. County of Chester, 68 F.3d 788, 797-98 (3d Cir.1995), cert. denied, 516 U.S. 1173, 116 S.Ct. 1265, 134 L.Ed.2d 213 (1996). In Carbone, the Supreme Court held that flow control laws that discriminate against out-of-state waste facilities trigger heightened scrutiny because they hoard a valuable economic resource such as garbage. 511 U.S. at 389-93, 114 S.Ct. at 1682-83. A discriminatory state statute is per se unconstitutional "save in a narrow class of cases in which the municipality can demonstrate, under rigorous scrutiny, that it has no other means to advance a legitimate state interest." Id. at 392, 114 S.Ct. at 1683, citing Maine v. Taylor, 477 U.S. 131, 106 S.Ct. 2440, 91 L.Ed.2d 110 (1986).
 
 
 33
 Following the Supreme Court's decision in Carbone, we held that New Jersey's solid waste disposal laws, "in effect and by design," discriminated against interstate commerce and therefore triggered heightened scrutiny under the dormant Commerce Clause. Atlantic Coast I, 48 F.3d at 710. We described New Jersey's flow control laws as follows:
 
 
 34
 Like the governmental entities in the other cases involving local processing requirements, New Jersey is regulating a market which the Commerce Clause intended to be open to non-local competitors. More specifically, New Jersey is regulating the market for solid waste processing and disposal services in each of the districts by directing district consumers of those services to utilize a favored service provider who, in the absence of exceptional circumstances, operates a local facility. It necessarily follows, we conclude, that any Commerce Clause analysis of New Jersey's flow control regulations must employ the heightened scrutiny test and that the district court erred by subjecting them only to the balancing test of Pike.
 
 
 35
 Id., at 710-11 (emphasis added). Based on our conclusion that the State's solid waste program was discriminatory, we remanded the case to the district court to determine whether the statute nevertheless fell into that "narrow class of cases" in which the State could prove that it lacked viable means of satisfying a legitimate, nondiscriminatory interest. Id., at 717.
 
 
 36
 On remand, the defendants argued that a later opinion of this Circuit, Harvey & Harvey, Inc. v. County of Chester, 68 F.3d 788 (3d Cir.1995), "clarified" our earlier decision in Atlantic Coast I. In Harvey, we held that the Supreme Court's decision in Carbone did not "establish a per se rule subjecting all flow control ordinances to strict scrutiny." Harvey, 68 F.3d at 800. According to the County Authorities, the district court, in light of our decision in Harvey, should have severed the State's purpose of self-sufficiency from our consideration of the statute in Atlantic Coast I and should have then reviewed the flow control laws and the individual waste disposal plans of the twenty-two waste disposal districts separately to determine whether they were still discriminatory. The district court rejected the County Authorities' request. "The Third Circuit found the system to be discriminatory, and the Court will not revisit the holding." Atlantic Coast II, 931 F.Supp. at 346.
 
 
 37
 We affirm the district court's decision because our determination in Atlantic Coast I that New Jersey's flow control laws discriminated against interstate commerce was based not just on New Jersey's stated goal to create a self-sufficient in-state waste disposal program. It was also based on the management districts' selection of facilities and the codification of this selection by state regulation. As we noted in Harvey, a law that directs waste to a particular facility will not necessarily violate the dormant Commerce Clause as long as out-of-state operators are given an even chance to compete for the opportunity to dispose of the state or district's waste. See 68 F.3d at 802. In New Jersey, however, state policy had precluded such open competition and the list of facilities designated in N.J.A.C. § 7:26-6.5 reflects that policy. As a result of this discriminatory policy, the flow control regulations, through § 7:26-6.5, have limited the facilities that can accept waste generated in a particular district to those so designated in the regulation. Because the policy has affected the existing designations, it cannot be "severed" from the rest of the statute for purposes of review under the Commerce Clause.
 
 
 38
 The fact that a district court in the Waste Management case has enjoined the State of New Jersey from acting on its policy of abrogating, rejecting or foreshortening contracts between management districts and out-of-state waste disposal facilities does not alter our determination that New Jersey's flow control statutes discriminate against out-of-state facilities. See Waste Management, No. 94-1983, amended order (D.N.J. October 29, 1996). First, the Waste Management injunction, as modified by the district court, applies only prospectively to future contracts between management districts and waste disposal facilities. It does not affect the current contractual agreements codified at N.J.A.C. § 7:26-6.5, which are the result of a discriminatory process. Second, the Waste Management injunction addresses only the state's approval or ratification of a waste management district's disposal plan, and not the district's initial choice of a facility. Our finding of discriminatory purpose and effect in Atlantic Coast I, however, applied both to the waste management district's choice of a facility to service its needs and to the State's approval of that choice.
 
 
 39
 In response to the argument of the County Authorities, Atlantic Coast urges that the defendants should not use this appeal to relitigate issues already resolved in prior rulings by this Court. We agree. The law of the case doctrine bars our reconsideration of issues previously resolved by an earlier panel. See Fagan v. City of Vineland, 22 F.3d 1283, 1290 (3d Cir.1994); Hayman Cash Register Co. v. Sarokin, 669 F.2d 162 (3d Cir.1982). Since none of the traditional exceptions to the law of case doctrine apply here (our previous decision was not clearly erroneous, no intervening "new law" has been decided other than the district court's injunction in Waste Management, and no new facts have surfaced), there is no reason to revisit the issue of whether the New Jersey waste disposal system is discriminatory. See generally Bridge v. United States Parole Commission, 981 F.2d 97, 102 (3d Cir.1992) (discussing general exceptions to law of case doctrine). A previous panel found discriminatory effect in Atlantic Coast I, 48 F.3d 701. We are bound by that determination. Nothing we said in Harvey changes our decision in Atlantic Coast I as it applies to the facts of this case. Accordingly, we affirm the district court's application of heightened scrutiny to New Jersey's flow control statutes.
 
 B. Application of Heightened Scrutiny
 
 40
 Concluding that the district court correctly applied heightened scrutiny to New Jersey's waste disposal statutes, we now turn to the district court's finding that the flow control statutes were unconstitutional because the State of New Jersey did not uphold its burden under the heightened scrutiny test.[15] While we review the lower court's application of constitutional law de novo, we will reverse the district court's factual findings only if they are clearly erroneous. Fabulous Assoc., Inc. v. Pennsylvania Public Utility Comm'n, 896 F.2d 780, 783 (3d Cir.1990).
 
 
 41
 Once a district court finds that a state statute discriminates against interstate commerce, "the burden falls on the State to demonstrate both that the statute 'serves a legitimate local interest,' and that this purpose could not be served as well by available nondiscriminatory means." Maine v. Taylor, 477 U.S. at 139, 106 S.Ct. at 2447; Hughes v. Oklahoma, 441 U.S. 322, 99 S.Ct. 1727, 60 L.Ed.2d 250 (1978). We now engage in the two-part inquiry set forth by Maine and Hughes.[16]
 
 
 42
 The district court found five legitimate justifications for New Jersey's solid waste disposal regulatory system:
 
 
 43
 (i) assurance of long-term disposal capacity for all waste generated in New Jersey; (ii) support for development of environmentally safe capacity; (iii) promotion of recycling and source reduction; (iv) assistance in the prevention of illegal dumping and the control of illegal facilities; and (v) protection of the fiscal integrity of the governmental entities.
 
 
 44
 Atlantic Coast II, 931 F.Supp. at 346, p 1. We agree that these five interests are legitimate objectives of the State. To justify a discriminatory statute, however, a state must do more than cite a legitimate interest; it must also show that it lacks alternative nondiscriminatory means of achieving that interest. Here, we agree with the district court that the defendants have failed to satisfy this second prong.
 
 
 45
 In Atlantic Coast II, the district court stated that "[d]efendants have not even come close to proving that a constitutional, nondiscriminatory alternative cannot address the various interests identified in pp 1 and 21, supra, as well or better than the current flow control regulations." Atlantic Coast II, 931 F.Supp. at 351, p 25. The district court further observed:
 
 
 46
 The above-market tipping fees that constitute the heart of New Jersey's flow control system are more or less a hidden tax paid by New Jersey residents. The tipping fees are used to cover not only the debt service of the bonds issued to fund facilities under flow control, but also to cover the fixed costs of operating waste disposal facilities, financing recycling programs and other environmentally friendly recovery projects, and developing long-term disposal plans. Those activities could be financed through up-front taxes, user fees or other charges that do not discriminate against interstate commerce. Even if there are significant costs to implementing the necessary revisions to the current flow control system, nothing in the record suggests that these would be exorbitant or beyond the capabilities of reasonable fundraising alternatives. And, in any case, the threat of some increase in costs cannot negate the constitutional mandate of the dormant Commerce Clause.
 
 
 47
 Id., at 353-54 (emphasis added). We affirm the district court's interpretation of the dormant Commerce Clause and its application of the Clause to the facts.
 
 
 48
 The County Authorities and the State argue, however, that the flow control laws are indispensable. First, they claim that these laws are necessary to prevent illegal dumping and other environmentally unsound practices. Second, they contend that these laws are necessary to underwrite the cost of paying off the debt on the locally constructed waste disposal facilities. In regard to the first of these contentions, neither the County Authorities nor the State has cited record evidence to show that alternative measures are unable to prevent illegal or unsafe dumping of waste.[17] Accordingly, we will consider their argument only as it pertains to the financial effect of giving up the current flow control system.
 
 
 49
 The County Authority defendants and State defendants each attack the district court's decision on slightly different grounds. The County Authorities argue that "Plaintiffs/Appellants have offered no evidence that there was any alternative, as of 1970, that could have achieved the lawful public purposes 'as well' with less discrimination against interstate commerce." County Authorities Br., at 11 (emphasis added). This argument lacks merit for several reasons. First, it locates the burden of proof with the wrong party. The Supreme Court has stated quite clearly that once a statute triggers heightened scrutiny, the party defending the statute bears the burden of proof. See Maine, 477 U.S. at 138, 106 S.Ct. at 2447. Second, the County Authorities focus too much attention on the phrase "as well" when defining the content of the heightened scrutiny test. The heightened scrutiny test, however, concerns itself with questions of viability, not questions of convenience. See Carbone I, 511 U.S. at 392, 114 S.Ct. at 1683. Finally, the County Authorities' argument fails because it measures the viability of the nondiscriminatory alternatives in terms of past and not present events. The Supreme Court has held that environmental and economic arguments must be rejected "absent the clearest showing that the unobstructed flow of interstate commerce itself is unable to solve the local problem." Id. (emphasis added). The operative word in this sentence is the verb "is". The question is not what was the best system for New Jersey when the statutes were adopted, but rather whether any non-discriminatory system could now serve New Jersey's legitimate goals of solid waste disposal in an efficient and environmentally safe manner. Because the County Authorities have failed to address this question with evidence relating to the present time, they have not fulfilled their burden under the dormant Commerce Clause.
 
 
 50
 Like the County Authorities, the State of New Jersey has also failed to demonstrate why the district court's factual determination that nondiscriminatory alternatives were at least feasible was clearly erroneous. The gravamen of the State's defense is that the elimination of flow control laws will force local waste disposal authorities to compete with out-of-state firms. Competition, in turn, will preclude local facilities from charging inflated tipping fees. Consequently, local facilities constructed with bond money will attract lower volumes of waste and will lose operating revenue, reducing their ability to pay off their debt to the bondholders. Debt issues will risk default, and local waste disposal facilities will incur operating deficits. Finally, default on the solid waste disposal facilities will affect the health of debt instruments issued by other government entities in New Jersey. Atlantic Coast II, 931 F.Supp. at 350, p 20. The State defendants descriptively dub this scenario as the "death spiral."
 
 
 51
 Although we concede that the consequences of defaulting on the local waste facilities' substantial loans cannot be minimized or ignored, we disagree with the State's presumption that its problems are insurmountable. The district court listed several alternatives by which the State could lift its flow control laws yet ensure the financial integrity of the local government entities. In particular, the court suggested that the State: (1) issue new bonds to refinance its in-state solid waste disposal facilities, (2) implement "user charges" for those who use the facilities or a "system benefit charge" to make up for lost funds, (3) issue a statewide solid waste tax (or assessment) on all waste generated in state regardless of where it was sent (in or out of state) for disposal, (4) have the municipalities establish long term contracts with solid waste facilities (assuming, of course, that out-of-state facilities could compete with in-state facilities on an equal footing), or (5) fund the system through a combination of municipal, county, or State "general revenues" (i.e. taxes). Atlantic Coast II, 931 F.Supp. at 351, p 23.
 
 
 52
 According to the district court, the State defendants did not shoulder their burden of demonstrating that none of the suggested alternatives could satisfactorily finance--either individually or through some combination--their waste disposal needs. Rather, the defendants "merely caricatured each of the tools that may be used in building a new system." Id. at 351, p 25. The district court elaborated:
 
 
 53
 In its submissions to the Court, the State does not attempt to develop a comprehensive, cohesive plan using the wide variety of political and financial tools available to it. Rather, the defendants have looked at a series of one-dimensional alternatives in isolation and only attempted to prove that no one technique (e.g., system benefit charges, user fees, new taxes, refunding bonds, county or state assumption of debt) can possibly do the job. These isolated distortions do not constitute a fair and adequate attempt at evaluating available alternatives.
 
 
 54
 Atlantic Coast II, 931 F.Supp. at 354. Based on the evidence in the record, we conclude that the district court did not commit clear error when it determined that viable alternatives to the flow control laws could accomplish the defendants' legitimate objectives. Moreover, on appeal, the State has also failed to demonstrate why the current flow control regulations are the only viable means of ensuring the financial integrity of its waste management districts.[18]
 
 
 55
 We sympathize with the State defendants to the extent that local and state officials understandably presumed New Jersey's flow control laws to be constitutional when they issued bonds to build the local waste disposal facilities. See Filiberto, 857 F.2d at 923. Nevertheless, sympathy cannot cloud reason. It is clear to this Court that a key benefit of discriminatory flow control laws is that they ensure higher levels of revenue for local facilities by excluding foreign competition. The Supreme Court has held, however, that "[b]y itself ... revenue generation is not a local interest that can justify discrimination against interstate commerce." Carbone I, 511 U.S. at 393, 114 S.Ct. at 1684. We cannot permit the State of New Jersey to discriminate in order to raise money to service waste management debt merely because the funds are necessary to finance that debt. In reviewing the State's need to raise money to finance the local authorities' debt obligations, the district court properly did not limit its consideration to waste management district fees as the sole possible source of those funds. The State has not proven--to the district court or to this Court--why none of the five alternate methods of financing described by the district court are able to service the local authorities' debt.
 
 
 56
 With regard to the district court's suggestion that the State issue new "refunding" bonds to refinance the disposal facilities' debt, the State contends that, depending on the interest rate of the new bonds, it might incur huge losses. This may be true, but the State's financial losses alone cannot justify discrimination against interstate commerce. The Supreme Court has long held that the expense of dismantling a discriminatory system does not justify a state's continued enforcement of that system. McKesson Corp. v. Division of Alcoholic Beverages and Tobacco, 496 U.S. 18, 51, 110 S.Ct. 2238, 2257 n. 35, 110 L.Ed.2d 17 (1990) (tax refund remedy for statute struck down as violative of dormant Commerce Clause could not be denied on grounds of cost to State). Cf. Watson v. City of Memphis, 373 U.S. 526, 537, 83 S.Ct. 1314, 1321, 10 L.Ed.2d 529 (1963) (vindication of equal protection rights "cannot be made dependent on any theory that it is less expensive to deny than to afford them").
 
 
 57
 The State further argues that a bond refinancing "would likely have a significant and detrimental impact on the State's bond rating and thus, the State's ability to raise capital for other public works." Without addressing the accuracy of this forecast, we merely point out that a bond refund would impact only one method of raising capital. It would not affect the State's ability to finance public works through taxes or other sources of revenue.
 
 
 58
 The district court also suggested that the State implement "user charges" or a "systems benefit charge" to make up for the local waste disposal facilities' lost revenue in the event that the flow control laws are declared unconstitutional. The State responds that this alternative is not viable because (1) it may be unauthorized under current state statutes as a source of revenue, and (2) such an alternative can work only "when a jurisdiction is writing on a clean slate". We disagree. First, the legality of the proposed alternative under state law is irrelevant to a court's heightened scrutiny inquiry because the legislature can re-write its statutes if it has the desire or the need to do so. Second, the fact that the waste facility bonds are already outstanding does not explain why their debt could not be serviced with revenues from supplemental user charges as opposed to revenues from a captured waste-disposal market.
 
 
 59
 With regard to the suggestion for a special tax on all waste generated within the State, regardless of its final destination, the State suggests that this tax itself might be held unconstitutional. Because this issue is not before us, we will not determine the constitutionality of a special tax on solid waste. Even if we should assume, however, that this alternative is not viable, there are still other avenues open to the State. General tax revenues, raised either by the State or by the individual counties, can service the debt of the local facilities. In short, various options are open to State and local officials if they desire to use them.
 
 
 60
 We add that this is not the first time a local or state law has been struck down under the Commerce Clause to the financial detriment of a local entity that depended on a prior regime.[19] In Carbone, the Supreme Court struck down Clarkstown's flow control ordinance, despite the town's worry that the local waste disposal facility might lack long-term survival. The Court opined that "having elected to use the open market to earn revenues for its project, the town may not employ discriminatory regulation to give that project an advantage over rival businesses from out of State." 511 U.S. at 394, 114 S.Ct. at 1684. The State of New Jersey argues nevertheless that the principles expounded by the Supreme Court in Carbone are inapplicable because substantially greater financial concerns arise with the elimination of a state-wide flow control system than with a county or district-wide system. We cannot accept this argument since it would insulate large regulatory systems from the dictates of the Commerce Clause, despite the fact that they cast a wide net and hoard a valuable resource, e.g., an entire state's solid waste. It makes little sense to permit the perpetuation of wide-spread discrimination simply because the cost of dismantling the discriminatory system is greater on a state-wide level than it is on a district or county level.
 
 
 61
 Based on the preceding analysis, we hold that the State of New Jersey cannot protect the local waste disposal market, and thereby exclude out-of-state competitors, in order to use inflated revenues to finance the substantial debts of its waste management districts. Alternatives to the current regime of flow control laws are available to the State and to the County Authorities. We therefore affirm the district court's conclusion that New Jersey's present flow control system is unconstitutional under the dormant Commerce Clause.C. The Scope of The Injunction
 
 
 62
 After it had determined that New Jersey's regulations of flow control violated the commerce clause, the district court enjoined their enforcement:
 
 
 63
 An INJUNCTION is hereby entered ... against enforcement of the New Jersey waste flow regulations to the extent these regulations discriminate against interstate commerce....
 
 
 64
 Atlantic Coast II, 931 F.Supp. at 359. Due to the fact that New Jersey's waste disposal statutes cover a number of subjects unrelated to flow control, the above language of the district court's injunction is not clear as to which parts of SWUCA or SWMA are to be enjoined. Consequently, we shall clarify the injunction based on the representations of the parties at oral argument, as well as our understanding of the plaintiffs' petition, which seeks "a declaratory judgment that the solid waste plans identified in N.J.A.C. § 7:26-6:5 violate the Commerce Clause of the United States Constitution and an injunction against enforcement of these regulations[,]" 931 F.Supp. at 343. In doing so, we eliminate the necessity for further proceedings in the district court regarding this important issue and direct the clerk of this court to enter the injunction as set forth at the end of this opinion. See Evans v. Buchanan, 555 F.2d 373, 381 (3d Cir.1977) (en banc) (modifying district court's interdistrict injunctive remedy in desegregation of public school system).
 
 
 65
 N.J.A.C. § 7:26-6.5 codifies the designated facilities for waste disposal within each of New Jersey's twenty-two waste management districts.[20] As we have discussed in Part II.B., this regulation is unconstitutional because it has discriminated against out-of-state waste disposal facilities in the process through which facilities were designated to dispose of each district's waste.
 
 
 66
 In view of the specificity of the plaintiffs' request in their complaint, as well as our understanding of the dormant Commerce Clause, we limit the scope of the district court's injunction to the pertinent provisions of N.J.A.C. § 7:26-6.5. Pursuant to the effect of the injunction, the disposal facilities presently listed there can no longer be considered the facilities to which each district's solid waste must be directed. The waste management districts must modify their plans to select new disposal facilities pursuant to N.J.A.C. §§ 7:26-6.6 and 6.7. It goes without saying that the waste management districts must not discriminate against out-of-state facilities when they modify their plans.
 
 
 67
 Moreover, insofar as New Jersey's self-sufficiency policy has precluded the designation of out-of-state waste disposal facilities, this injunction mirrors the injunction issued in Waste Management in that NJDEP can no longer implement its self-sufficiency policy--either formally or informally--by rejecting or hindering contracts between waste management districts and out-of-state facilities or operators.
 
 
 68
 The injunction does not bar the enforcement of the State's remaining portions of either SWUCA or SWMA. The surviving portions of these statutes are not included within the scope of plaintiffs' petition and, in addition, they do not, in and of themselves, discriminate against interstate commerce. For example, out-of-state facilities wishing to proceed in the collection of solid waste will have to obtain a certificate of public convenience from the Board of Public Utilities and register with NJDEP prior to commencing service. N.J.S.A. § 48:13A-6. The certificate allows the State to regulate the rates charged by the individual seeking certification. See N.J.S.A. §§ 48:13A-4, 7.5, 7.13, 7.15, 7.20. Out-of-state facilities also will remain subject to New Jersey's environmental laws and regulations, as well as to its record keeping requirements and transportation regulations. See N.J.S.A. § 48:13A-9(b) (enabling State to suspend corporation's certificate to collect waste if it violates "any provision of any laws related to pollution of the air, water or lands" of the state); N.J.S.A. § 48:13A-7.16 & 7.17 (enabling Board of Public Utilities to compel "any person engaged in the business of solid waste collection" to provide annual report, business records or documents related to collection services).
 
 
 69
 The State has also alluded to potential traffic disruption that may result from imposition of an injunction. However, the injunction concerns only the ultimate destination of the trash, as opposed to the manner in which it is collected. Moreover, local authorities will be able to retain the discretion to regulate the traffic routes used by in-state and out-of-state trash collectors alike.[21]
 
 
 70
 In citing the above regulatory provisions that will remain in effect despite the enjoining of N.J.A.C. § 7:26-6.5, we do not present an all-inclusive list. We do not need to do so because, if the process for selecting waste disposal facilities no longer discriminates against interstate commerce, neither will the regulatory provisions enforcing such a nondiscriminatory system. Although the State of New Jersey may no longer preclude the designation of out-of-state waste disposal facilities or operators, the State and the County Authorities remain free to regulate the flow of waste within New Jersey so long as the State's laws and regulations treat in-state and out-of-state facilities equally. See Harvey, 68 F.3d at 801-02.
 
 III. THE STAY
 
 71
 After it had found the flow control laws in New Jersey to be unconstitutional, the district court took the extraordinary step of issuing, sua sponte, a two-year stay of the Carbone plaintiffs' permanent injunction. The stay is to go into effect upon the exhaustion of all appeals or petitions for certiorari to the Supreme Court. In justifying the stay, the district court reasoned:
 
 
 72
 The Court recognizes the enormity of the task which Carbone I and the Third Circuit opinion in Atlantic Coast have imposed on New Jersey citizens. To scrap immediately a detailed regulatory plan implemented over the course of decades and relied upon by investors, business people, and political figures would wreak havoc on the financial and environmental well-being of New Jersey citizens. The Court must permit the relevant governmental bodies to develop the specific nondiscriminatory alternative which they wish to employ, and this development cannot be done overnight.
 
 
 73
 Atlantic Coast II, 931 F.Supp. at 358.
 
 
 74
 As a consequence of the stay, Carbone and similarly situated waste disposal firms may not collect or dispose of trash until two years after the last appeal or petition for certiorari has been denied. The Carbone plaintiffs appeal the imposition of the stay as unconstitutional. The State and the County Authorities defend the stay as a permissible exercise of equitable discretion. Our review of the legal issues involved in the issuance of the stay, including its constitutionality, is plenary. The fashioning of the remedy is reviewed for abuse of discretion, and the district court's findings of fact are reviewed for clear error. See Northeast Women's Center, Inc. v. McMonagle, 939 F.2d 57, 61 (3d Cir.1991).
 
 
 75
 We agree with the plaintiffs. Whatever the district court's power may be to delay constitutional relief, none of the justifications raised by the defendants support the extraordinary act of delaying the injunction of an unconstitutional law.[22] Consequently, we will vacate the district court's stay insofar as it will extend past the exhaustion of appeal or petition for certiorari in this case.[23]
 
 
 76
 Before arriving at this conclusion we have carefully considered the contentions of the defendants. They provide three justifications for the district court's stay. First, the defendants attempt to analogize this case to school desegregation[24] and prison reform[25] cases by arguing that they need time to create a new waste disposal system that does not violate the Commerce Clause. Second, the defendants maintain that a stay is necessary to combat the environmental effects of allowing out-of-state entities access to New Jersey's waste disposal market. Finally, the defendants contend that the financial cost of an immediate injunction is so great that it justifies the district court's post-appeal stay.
 
 
 77
 We reject the defendants' arguments as lacking merit. First, the defendants maintain that the district court's injunction forces them to create an entirely new waste disposal system, and that the two-year stay is necessary to enable them to solve the administrative difficulties of constructing such a system. We disagree. As we stated in Part II. C., supra, the district court's injunction extends no further than N.J.A.C. § 7:26-6.5. Our decision today leaves the bulk of New Jersey's waste disposal system in place, except that the twenty-two waste management districts must modify their waste disposal plans and choose new facilities to service their needs in a non-discriminatory fashion. The twenty-two management districts already have the power to modify their disposal plans under N.J.A.C. § 7:26-6.6. Moreover, NJDEP may issue temporary emergency orders to redirect the flow of waste pursuant to N.J.A.C. § 7:26-6.7(a).[26] Thus, the defendants have all the tools necessary to bring their waste disposal system within the ambit of the Commerce Clause. A two-year post-appeal stay, which would subject the Carbone plaintiffs and similarly situated out-of-state facilities to an unconstitutional regulation, is therefore not justified by the defendants' so-called "administrative" concerns.
 
 
 78
 The defendants also claim that they need a two-year stay in order to deal with the grave environmental threats posed by the district court's injunction. According to the defendants, an immediate injunction might result in chaos or a disruption of waste disposal and collection within the state, thereby creating a multitude of environmental and health-related problems.
 
 
 79
 The defendants' fears are unfounded. The district court's injunction does not threaten the environmental well-being of the citizens of New Jersey in any manner whatsoever. All it does is force the waste management districts to choose new waste disposal facilities on a non-discriminatory basis. The Commerce Clause itself teaches us that we cannot assume that out-of-state facilities will dispose of or collect waste in any less an environmentally responsible manner than facilities located within the State. Furthermore, the district court's injunction does not affect those provisions of the SWUCA or SWMA that regulate the granting of certificates of convenience or the suspension of those certificates for violations of New Jersey's air, water or land pollution laws. Thus, just as the defendants' environmental arguments are insufficient to support their Commerce Clause argument, so too are they insufficient to support their argument for the district court's stay.
 
 
 80
 In reality, the relief that the defendants seek is relief from the financial threat to local waste disposal facilities if those facilities are unable to charge artificially high tipping fees. This economic impact is real but it cannot justify the district court's imposition of a post-appeal stay. As we demonstrate below, the Supreme Court has established that, whatever the economic costs of remedying a constitutional violation, the mere expense of the remedy cannot justify the withholding of the plaintiffs' requested relief.
 
 
 81
 The financial expense arguments offered by the State and the County Authorities in support of the district court's stay mirror the defendants' arguments in favor of finding flow control constitutional under the Commerce Clause. By enjoining the enforcement of New Jersey's flow control laws, the defendants urge, we shall cause the local waste disposal facilities to lose a large portion of the tipping fees on which they depend to service their debt. Just as we rejected this argument in our Commerce Clause analysis, we must also reject it in our discussion of the district court's stay.
 
 
 82
 Our Constitution ordinarily demands "prompt rectification" of constitutional violations, absent an "overwhelmingly compelling reason". Watson, 373 U.S. at 533, 83 S.Ct. at 1318 (1963). The Supreme Court's decision in Watson itself demonstrates that the defendants' financial problems could not constitute the "compelling reason" for delaying a remedy. Watson involved the desegregation of public parks. Rejecting the defendants' argument that desegregated parks would require additional supervision and thereby cost too much money, the Supreme Court declared, "[I]t is obvious that vindication of conceded constitutional rights cannot be made dependent upon any theory that it is less expensive to deny than to afford them." Id., 373 U.S. at 537, 83 S.Ct. at 1321.
 
 
 83
 A generation later, the Supreme Court echoed this theme in McKesson v. Division of Alcoholic Beverages and Tobacco, 496 U.S. 18, 110 S.Ct. 2238, 110 L.Ed.2d 17 (1990). McKesson concerned the issue of what constituted adequate relief for the wrongful payment of a state tax that had been held unconstitutional because it violated the dormant Commerce Clause. Unlike the district court's stay of the injunction in this case, the Florida Supreme Court in the McKesson case had at least enjoined the future enforcement of the unconstitutional state tax. The state court had nevertheless denied the petitioners any refund for taxes already paid. The Supreme Court held that this denial of a refund was unconstitutional because it failed to alter Florida's discrimination against the petitioners, who had paid the higher tax.[27] "If a State places a taxpayer under duress promptly to pay a tax when due and relegates him to a postpayment refund action in which he can challenge the tax's legality, the Due Process Clause of the Fourteenth Amendment obligates the State to provide meaningful backward-looking relief to rectify any unconstitutional deprivation." McKesson, 496 U.S. at 31, 110 S.Ct. at 2247. Although we do not decide the present case on Due Process grounds, we nevertheless conclude that McKesson bars the defendants from arguing that the financial cost of a constitutional remedy constitutes a justification for withholding that remedy.
 
 
 84
 The Supreme Court in McKesson explicitly rejected Florida's "equitable considerations," including the argument that the cost of the tax refund justified the court's withholding of such relief. In response to this argument, the Supreme Court stated:
 
 
 85
 We reject respondents' intimation that the cost of any refund considered by the State might justify a decision to withhold it. Just as a State may not object to another wise available remedy providing for the return of real property unlawfully taken or criminal fines unlawfully imposed simply because it finds the property or moneys useful, so also Florida cannot object to a refund here just because it has other ideas about how to spend the funds.
 
 
 86
 Id. at 51, 110 S.Ct. at 2257. The Supreme Court's reasoning in McKesson applies equally to the defendants' argument in this case. The enjoining of flow control in New Jersey will divert local revenue from local waste disposal facilities. The local authorities need revenue to service the disposal facilities' debt. This need does not, however, justify the State and the County Authorities' perpetuation of an unconstitutional law at the expense of out-of-state waste disposal facilities, which have been denied access to New Jersey's waste disposal market. Just as "revenue generation is not a local interest that can justify discrimination against interstate commerce[,]" revenue generation in and of itself cannot justify court ordered perpetuation of an unconstitutional law. Carbone, 511 U.S. at 393, 114 S.Ct. at 1684. The cost of lifting flow control in New Jersey cannot support the district court's "discretion" to impose a two-year stay.[28]
 
 
 87
 In arguing that the financial cost of the injunction justifies the stay, the State also relies on the equitable principles set out in Chevron Oil v. Huson, 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971).[29] According to the State, cases such as Chevron Oil support the district court's stay, since the construction of the local waste disposal facilities in New Jersey preceded the Supreme Court's decision striking down discriminatory flow control laws as unconstitutional in Carbone. However, the Supreme Court's latest retroactivity jurisprudence has overruled Chevron Oil 's equitable balancing test as the determinant of whether a new principle of law will be applied retroactively. See Reynoldsville Casket Co. v. Hyde, 514 U.S. 749, 751-53, 115 S.Ct. 1745, 1748, 131 L.Ed.2d 820 (1995); Harper v. Virginia Dept. of Taxation, 509 U.S. 86, 97, 113 S.Ct. 2510, 2517-18, 125 L.Ed.2d 74 (1993).
 
 
 88
 After Hyde and Harper, it is unclear as to what extent a court may, after "applying" a new principle of law retroactively, separately consider equitable factors in shaping an appropriate remedy for a constitutional violation. See Hyde, 514 U.S. at 754-55, 115 S.Ct. at 1749 ("[T]he ordinary application of a new rule of law 'backwards,' say, to pending cases, may or may not, involve a further matter of remedies. Whether it does so, and, if so, what kind of remedy [a] court may fashion depends--like almost all legal issues--upon the kind of case, matter, and circumstances involved.") (discussing James B. Beam Distilling Co. v. Georgia, 501 U.S. 529, 535, 111 S.Ct. 2439, 2443, 115 L.Ed.2d 481 (1991)). Moreover, if a court may still engage in a separate remedial inquiry, it is unclear what factors may be considered, and whether these include a defendant's reliance interests.[30] We need not decide any of these retroactivity questions in this case.[31] Even if we consider all of the State's justifications for a stay, we must conclude that they are insufficient to establish that a two-year post-appeal stay is an appropriate remedy for the constitutional violation involved here.
 
 
 89
 Our analysis of the record before us and of Supreme Court precedent leads us to conclude that the district court's post-appeal stay cannot stand. Plaintiffs' remedy cannot be denied or delayed based on the financial cost of enjoining the state's flow control laws. Because the impact of the injunction is solely economic, this case does not fall within the constitutional boundaries of district court's equitable discretion. We will, therefore, vacate the district court's post-appeal stay.
 
 IV. CONCLUSION
 
 90
 Under our holding, New Jersey lawmakers must now open up their waste disposal system so that out-of-state facilities and operators can compete for designation by the waste management districts. We cannot allow the State to deny or delay its obligation to open up the system because of the economic impact of our decision. The district court's stay will be reversed. Because of the weighty issues raised by this case and the agreement of all parties at oral argument to a stay pending appeal, we will, however, stay the injunction pending the exhaustion of the defendants' petition for certiorari to the Supreme Court. Upon denial of that petition, or the Court's rendering of a final decision in this case affirming this court's conclusions of law, the injunction sought by the plaintiffs will go into effect, immediately.
 
 
 91
 The district court's conclusion that New Jersey's flow control regulations are unconstitutional under the dormant Commerce Clause is AFFIRMED. The State is ENJOINED from enforcing N.J.A.C. § 7:26-6.5 as it is presently constituted.[32] The district court's two-year post-appeal stay is REVERSED. The injunction will be stayed, however, and become effective only upon the exhaustion or passage of time for all appeals or upon the denial of petitions for certiorari by the Supreme Court of the United States or upon the United States Supreme Court's final decision in this case affirming this court's judgment.
 
 APPENDIX
 
 92
 Copr. (C) West 1997 no claim to orig. U.S. govt. works
 
 NEW JERSEY ADMINISTRATIVE CODE TITLE 7
 
 93
 . DEPARTMENT OF ENVIRONMENTAL PROTECTION CHAPTER
 
 
 94
 26. SOLID WASTE SUBCHAPTER 6.
 
 INTERDISTRICT AND
 INTRADISTRICT SOLID WASTE FLOW
 
 95
 Current through April 7, 1997; 29 N.J. Reg. No. 7
 
 
 96
 7:26-6.5 District waste flow planning requirements and disposal facility designations(a) Waste flows within, into and out of the Atlantic County District:
 
 
 97
 1. All solid waste types 10, 23, and 25 generated from within all Atlantic County municipalities shall be directed to the Atlantic County Transfer Station, facility number 0108M, located in Egg Harbor Township, Atlantic County, New Jersey, prior to disposal at permitted out-of-State facilities in accordance with the laws and regulations of the receiving state. (Effective August 8, 1990).
 
 
 98
 i. Up to 12 tons per day of waste types 10 and 27 generated at the Atlantic County Community College and the Atlantic County Vocational Technical School, and from other commercial, industrial, and governmental generators as may later be determined by agreement between Atlantic County and relevant generators and haulers, shall be disposed of at the Atlantic County Resource Recovery Facility, facility number 0112C, located in Hamilton Township, Atlantic County, New Jersey.
 
 
 99
 2. All solid waste types 13 and 27 generated from within all Atlantic County municipalities shall be directed to the Atlantic County Landfill, facility number 0108N, located in Egg Harbor Township, Atlantic County, New Jersey.
 
 
 100
 (b) Waste flows within, into and out of the Bergen County District:
 
 
 101
 1. Two hundred and fifty thousand (250,000) tons per year of processible solid waste types 10 and 23 generated from within Bergen county and processed at the SalCar Transfer Station, facility number 02267b, located in Hillsdale Boro, Bergen County, the DiBella Transfer Station, facility number 0247B, located in Park Ridge Boro, Bergen County, the National Transfer Station, facility number 0231A, located in Lodi Boro, Bergen County, the Garofalo Transfer Station, facility number 0221A, located in Garfield City, Bergen County, and the United Carting Transfer Station, facility number 0218A, located in Fairview Boro, Bergen County, shall be transported directly to the Essex County Resource Recovery Facility, facility number 0714X, located in Newark, Essex County, New Jersey. (Effective May 1, 1991).
 
 
 102
 i. All residual ash generated from the operation of the Essex County RRF shall be disposed of by the Bergen County Utilities Authority (BCUA) consistent with the agreement between the BCUA and Essex County and in compliance with the Essex County RRF facility permit at permitted and approved out-of-State landfill facilities. (Effective May 1, 1991).
 
 
 103
 ii. Bypass waste and nonprocessible waste generated from the operation of the Essex County RRF shall be disposed of consistent with the agreement between the BCUA and Essex County and in accordance with the provisions of the approved Essex County District Solid Waste Management Plan. (Effective May 1, 1991).
 
 
 104
 2. At the request of Essex County, processible solid waste types 10 and 23 generated within Bergen County in an amount not to exceed 1,600 tons per week in 1992, 2,000 tons per week from January 4, 1993 through February 28, 1993, and 1,700 tons per week from March 1, 1993 through July 31, 1993 shall be transported to the Essex County Resource Recovery Facility, facility number 0714X, located in Newark, New Jersey, on an as needed basis from one of the transfer stations set forth in (b)1 above or (b)4 below.
 
 
 105
 3. Except as may be required by the terms of (b)2 above, to the extent that the five private transfer stations set forth in (b)1 above process tonnages in excess of the 250,000 tons noted above, all excess processible solid waste types 10, 13, 23, 25 and 27 shall be directed from each individual transfer station to an approved out-of-State disposal facility as provided in the Bergen County Plan. (Effective May 19, 1992).
 
 
 106
 4. All remaining solid waste types 10, 13, 23, 25 and 27 generated within Bergen County and not processed by the five transfer stations identified in (b)1 above shall continue to be directed to the Bergen County Utilities Authority Transfer Station, facility number 0232C, located in North Arlington, Bergen County, prior to transportation to an approved out-of-State disposal facility as provided in the Bergen County Plan. (Effective May 1, 1991).
 
 
 107
 5. All solid waste type 10 generated from within North Arlington shall be disposed of at the HMDC 1-E Landfill [sic], facility number 0239D, located in North Arlington, Bergen County. Upon closure of the HMDC 1-E Landfill, all solid waste type 10 generated from within North Arlington shall be redirected to the Bergen County Utilities Authority Transfer Station, facility number 0232C, located in North Arlington, Bergen County, prior to transportation to permitted out-of-State disposal facilities in accordance with the laws and regulations of the receiving state.
 
 
 108
 (c) Waste flows within, into and out of the Burlington County District:
 
 
 109
 1. All solid waste types 10, 13, 23, 25 and 27 generated from within all Burlington County municipalities, with the exception of (c)1i noted below, shall be disposed of at the Burlington County Landfill, facility number 0318A, located in Florence and Mansfield Townships, Burlington County, New Jersey.
 
 
 110
 i. All waste types 10, 23, and 27 generated at the Fort Dix Army Base and the McGuire Air Force Base, located within New Hanover and North Hanover Townships, shall be disposed of at the Fort Dix Heat Recovery Incinerator, facility number 0325A, located in New Hanover Township, Burlington County. All nonprocessible and nonhazardous residual waste shall be disposed of at the Burlington County Landfill.
 
 
 111
 (d) Waste flows within, into and out of the Camden County District:
 
 
 112
 1. All residential waste types 10, 13, 23, 25 and 27 generated in Chesilhurst Borough, Waterford Township and Winslow Township shall be directed to the Winslow Township Transfer Station, facility number 0436I, located in Winslow Township, Camden County, New Jersey. Once transferred, the waste from the Winslow Township Transfer Station shall be disposed of at the South Camden Resource Recovery Facility, Facility Number 0408C, except for waste type 25 which shall continue to be directed from the transfer station to out-of-State disposal in accordance with the laws and regulations of the receiving state.
 
 
 113
 i. All commercial waste types 10, 13, 23, and industrial waste type 27 generated in Chesilhurst Borough, Waterford Township and Winslow Township shall be disposed of directly at the South Camden Resource Recovery Facility, Facility Number 0408C, except that waste type 25 shall continue to be disposed of directly out-of-State in accordance with the laws and regulations of the receiving state.
 
 
 114
 2. All waste types 23 and 27 and nonprocessible 13 generated from within the Camden County municipalities of Audubon Borough, Cherry Hill Township, Haddonfield Borough, Haddon Township, Lindenwold Borough, Merchantville Borough, Pennsauken Township, Tavistock Borough, and Voorhees Township shall be disposed of at the Pennsauken Township Sanitary Landfill, facility numbers 0427D1SE01, 0427D1SE03, and 0427A-E1, located in Pennsauken Township, Camden County, New Jersey.
 
 
 115
 i. All waste type 25 generated from within the Camden County municipalities of Audubon, Cherry Hill, Haddonfield, Haddon Township, Lindenwold, Merchantville, Pennsauken, Tavistock and Voorhees shall be disposed of out-of-State [sic] in an approved facility in accordance with the laws and regulations of the receiving state.
 
 
 116
 ii. All waste types 10 and processible 13 generated from within the Camden County municipalities of Audubon, Cherry Hill, Haddonfield, Haddon Township, Lindenwold, Merchantville, Pennsauken, Tavistock, and Voorhees shall be disposed of at the South Camden Resource Recovery Facility, facility number 0408C, located in Camden City, Camden County. (Effective January 13, 1992).
 
 
 117
 3. All solid waste types 10, 13, 23, and 27 generated within the Camden County municipalities of Audubon Park, Barrington, Bellmawr, Berlin Borough, Berlin Township, Brooklawn, Camden City, Chesilhurst, Clementon, Collingswood, Gibbsboro, Gloucester City, Gloucester Township, Haddon Heights, HiNella, Laurel Springs, Lawnside, Magnolia, Mt. Ephraim, Oaklyn, Pine Hill, Pine Valley, Runnemede, Somerdale, Stratford, Waterford, Winslow and Woodlynne shall be directed to the South Camden Resource Recovery Facility, facility number 0408C, located in Camden City, Camden County, New Jersey.
 
 
 118
 i. All waste type 25 from the municipalities listed in (d)3 above, and ash from the operation of the South Camden Resource Recovery Facility shall be disposed of at approved out-of-State facilities in accordance with the laws and regulations of the receiving state.
 
 
 119
 ii. All of the bypass and nonprocessible waste from the operation of the South Camden Resource Recovery Facility shall be disposed of at the Pennsauken Township Sanitary Landfill, facility numbers 0427D1SE01, 0427D1SE03, and 0427A-E1, located in Pennsauken Township, Camden County, New Jersey. Also, in the event that nonhazardous ash from the operation of the resource recovery facility cannot be disposed of at an out-of-State facility, such ash shall be disposed of at the Pennsauken Township Sanitary Landfill. (Effective January 13, 1992).
 
 
 120
 iii. In the event a unified rate system is established for all solid waste facilities within Camden County, all solid waste types 10, 13, 23, 25 and 27 generated from within Berlin Borough and Berlin Township shall be directed to the Winslow Township Transfer Station, facility number 0436I, located in Winslow Township, Camden County, New Jersey. Once transferred, the waste from the Winslow Township Transfer Station shall be disposed of at the South Camden Resource Recovery Facility, facility number 0408C, located [sic] in Camden City, Camden County, New Jersey, except that waste type 25 shall be directed from the transfer station to permitted out-of-State disposal facilities in accordance with the laws and regulations of the receiving state.
 
 
 121
 (e) Waste flows within, into and out of the Cape May County District:
 
 
 122
 1. All waste types 10, 13, 23, 25, and 27 generated from within the Cape May County municipalities of Avalon, Cape May City, Cape May Point Boro, Dennis, Lower, Middle, North Wildwood, Ocean City, Sea Isle City, Stone Harbor, Upper, West Cape May, West Wildwood, Wildwood, Wildwood Crest, and Woodbine shall be disposed of at the Cape May County regional landfill, facility number 0511C, located in Borough of Woodbine and Township of Upper, Cape May County, New Jersey.
 
 
 123
 (f) Waste flows within, into and out of the Cumberland County District:
 
 
 124
 1. All waste types 10, 13, 23, 25, and 27 generated from within the Cumberland County municipalities of Bridgeton, Commercial, Deerfield, Downe, Fairfield, Greenwich, Hopewell, Lawrence, Maurice River, Millville, Stow Creek, Shiloh, Upper Deerfield, and Vineland shall be disposed of at the Cumberland County regional landfill, facility number 0603B, located in Deerfield Township, Cumberland County, New Jersey.
 
 
 125
 (g) Waste flows within, into and out of the Essex County District:
 
 
 126
 1. All solid waste types 10, 13, 23, 25, and 27 generated from within the Essex County municipalities of Irvington, Livingston, Maplewood, Millburn, and South Orange are hereby directed to the Waste Management of New Jersey Transfer Station, located at 100 Avenue A, in the City of Newark, Essex County, New Jersey.
 
 
 127
 2. All solid waste types 10, 23, 25, and 27 generated from within the Essex County municipality of Newark are hereby directed to the Waste Management of New Jersey Transfer Station, located at 100 Avenue A, in the City of Newark, Essex County, New Jersey.
 
 
 128
 3. All solid waste types 10, 13, 23, 25, and 27 generated from within the Essex County municipalities of Belleville, Bloomfield, Caldwell, Cedar Grove, East Orange, Essex Fells, Fairfield, Glen Ridge, Montclair, North Caldwell, Nutley, Orange, Roseland, Verona, West Caldwell and West Orange are hereby directed to the Solid Waste Transfer and Recycling, Inc. Transfer Station, located at 442 Frelinghuysen Avenue, in the City of Newark, Essex County, New Jersey.
 
 
 129
 4. All solid waste type 13 generated from within the Essex County municipality of Newark is hereby directed to the Solid Waste Transfer and Recycling, Inc. Transfer Station, located at 442 Frelinghuysen Avenue, in the City of Newark, Essex County, New Jersey.
 
 
 130
 5. Upon commencement of operations of the Solid Waste Transfer and Recycling, Inc. Transfer Station, located at Hill Street, in the City of Orange, Essex County, New Jersey, all solid waste types 10, 23, 25, and 27 generated from within the Essex County municipalities of Belleville, Bloomfield, Caldwell, Cedar Grove, East Orange, Essex Fells, Fairfield, Glen Ridge, Montclair, North Caldwell, Nutley, Orange, Roseland, Verona, West Caldwell and West Orange shall be directed to this facility.
 
 
 131
 6. All solid waste types 10, 23, and 27 generated within the municipalities of Belleville, Bloomfield, Caldwell, Cedar Grove, East Orange, Essex Fells, Fairfield, Glen Ridge, Irvington, Livingston, Maplewood, Millburn, Montclair, Newark, North Caldwell, Nutley, Orange, Roseland, South Orange, Verona, West Caldwell, and West Orange is directed to the Essex County Resource Recovery Facility, facility number 0714X, located in Newark, Essex County, New Jersey.
 
 
 132
 i. All waste types 13, 25 and nonprocessible type 27 from the municipalities listed in (g)6 above, shall be disposed of at approved out-of-State [sic] facilities in accordance with the laws and regulations of the receiving state. Out-of-State disposal shall be via the Solid Waste Transfer and Recycling, Inc., Transfer Station, facility number 0714R, located in Newark, Essex County, New Jersey.
 
 
 133
 7. Two hundred and fifty thousand (250,000) tons per year of processible solid waste types 10 and 23 generated from within Bergen County and processed at the transfer stations listed in (b)1 above shall be directed to the Essex County Resource Recovery Facility, facility number 0714X, located in Newark, Essex County, New Jersey. (Effective May 1, 1991). In addition, at the request of Essex County, processible solid waste types 10 and 23 generated within Bergen County in an amount not to exceed 1,600 tons per week in 1992, 2,000 tons per week from January 4, 1993 through February 28, 1993, and 1,700 tons per week from March 1, 1993 through July 31, 1993 shall be transported to the Essex County Resource Recovery Facility, facility number 0714X, located in Newark, New Jersey, on an as needed basis from one of the transfer stations set forth in (b)1 and 4 above.
 
 
 134
 i. All residual ash generated from the operation of the Essex County RRF shall be disposed of by the BCUA consistent with the agreement between the BCUA and Essex County and in compliance with the Essex County RRF facility permit at permitted and approved out-of-State landfill facilities. (Effective May 1, 1991).
 
 
 135
 ii. Bypass waste and nonprocessible waste generated from the operation of the Essex County RRF shall be disposed of consistent with the agreement between the BCUA and Essex County and in accordance with the provisions of the approved Essex County District Solid Waste Management Plan. (Effective May 1, 1991).
 
 
 136
 (h) Waste flows within, into and out of the Gloucester County District:
 
 
 137
 1. All solid waste types 10, 13, 23, 25 and 27 generated from within the Gloucester County municipalities of Clayton, Deptford, East Greenwich, Elk, Franklin, Glassboro, Greenwich, Harrison, Logan, Mantua, Monroe, National Park, Newfield, Paulsboro, Pitman, South Harrison, Swedesboro, Washington, Wenonah, West Deptford, Westville, Woodbury, Woodbury Heights, and Woolrich, shall be disposed of at the Gloucester County Landfill, facility number 0816A, located in South Harrison Township, Gloucester County, New Jersey.
 
 
 138
 2. When the Gloucester County resource recovery facility becomes operational, solid waste types 10, 13, 23 and 25 generated in all of Gloucester County's municipalities shall be directed to the resource recovery facility, facility number 0820I, located in West Deptford Township, Gloucester County, New Jersey.
 
 
 139
 3. All bypass waste and nonhazardous ash from the resource recovery facility shall be disposed of at the Gloucester County Landfill, facility number 0816A, located in South Harrison Township, Gloucester County, New Jersey.
 
 
 140
 (i) Waste flows within, into and out of the Hackensack Meadowlands District:
 
 
 141
 1. The Hackensack Meadowlands Development Commission shall accept certain waste flows from Bergen and Hudson Counties as described in (b) above and (j) below.
 
 
 142
 (j) Waste flows within, into and out of the Hudson County District:
 
 
 143
 1. All waste types 13, 23, 25, and 27 generated from within the Hudson County municipalities of Bayonne City, East Newark Boro, Guttenberg Town, Harrison Town, Hoboken City, Jersey City, Kearny Town, North Bergen Township, Secaucus Town, Union City, Weehawken Township and West New York Town [sic] shall be directed to the Hackensack Meadowlands Development Commission Baler facility, facility number 0239C, located in North Arlington, Bergen County, New Jersey for handling prior to transportation to out-of-State permitted disposal facilities in accordance with the laws and regulations of the receiving state. (Effective February 4, 1991).
 
 
 144
 2. All waste type 10 generated from within the Hudson County municipalities of Bayonne City, East Newark Boro, Guttenberg Town, Harrison Town, Hoboken City, Jersey City, Kearny Town, North Bergen Township, Secaucus Town, Union City, Weehawken Township and West New York Town shall be directed to the Hackensack Meadowlands Development Commission Baler facility, facility number 0239C, located in North Arlington, Bergen County, New Jersey, for baling prior to disposal at the Hackensack Meadowlands Development Commission 1-E landfill, facility number 0907W, located in North Arlington, Bergen County, New Jersey. (Effective February 4, 1991).
 
 
 145
 3. Upon closure of the HMDC 1-E landfill, all waste type 10 generated from within the Hudson County municipalities of Bayonne City, East Newark Boro, Guttenberg Town, Harrison Town, Hoboken City, Jersey City, Kearny Town, North Bergen Township, Secaucus Town, Union City, Weehawken Township and West New York Town shall be directed to the Hackensack Meadowlands Development Commission Baler facility, facility number 0239C, located in North Arlington, Bergen County, New Jersey for handling prior to transportation to out-of-State permitted disposal facilities in accordance with the laws and regulations of the receiving state. (Effective February 4, 1991).
 
 
 146
 (k) Waste flows within, into and out of the Hunterdon County District:
 
 
 147
 1. All solid waste types 10, 13, 23, 25, and 27 generated from within the Hunterdon County municipalities of Alexandria, Bethlehem, Bloomsbury, Califon, Clinton Town, Clinton Township, Delaware, East Amwell, Flemington, Franklin, Glen Gardener, Hampton, High Bridge, Holland, Kingwood, Lambertville, Lebanon Boro, Lebanon Township, Milford, Raritan, Readington, Tewksbury, Union and West Amwell shall be transported to the Hunterdon County transfer station, facility number 1006B, located in Clinton Township, Hunterdon County.
 
 
 148
 2. All solid waste types 10, 13, 23, 25, and 27 generated from within the Hunterdon County municipalities of Stockton and Frenchtown shall be transported to the Hunterdon County transfer station, facility number 1006B, located in Clinton Township, Hunterdon County.
 
 
 149
 3. Up to 100 tons per day of processible solid waste generated within Hunterdon County shall be transported from the Hunterdon County Transfer Station, facility number 1006B, located in Clinton Township, Hunterdon County, New Jersey, to the Warren County Resource Recovery Facility, facility number 2117A, located in Oxford Township, Warren County, New Jersey, through the year 2001. (Effective June 1, 1988).
 
 
 150
 (l ) Waste flows within, into and out of the Mercer County District:
 
 
 151
 1. All solid waste types 10, 13, 23, 25, and 27 generated from within all Mercer County municipalities shall be directed to the Mercer County Transfer Station, facility number 1102D, located in Ewing Township, Mercer County, New Jersey, for processing prior to disposal at the G.R.O.W.S. landfill in Bucks County, Pennsylvania, in accordance with the laws and regulations of the receiving state. (Effective November 1, 1988).
 
 
 152
 (m) Waste flows within, into and out of the Middlesex County District:
 
 
 153
 1. All solid waste types 10, 13, 23, 25, and 27 generated from within all municipalities in Middlesex County shall be disposed of at the Middlesex County Utilities Authority Landfill (Edgeboro), facility number 1204A, located in East Brunswick, Middlesex County, New Jersey. (Effective July 19, 1990).
 
 
 154
 (n) Waste flows within, into and out of the Monmouth County District:
 
 
 155
 1. All solid waste types 10, 13, 23, 25, and 27 generated from within all Monmouth County municipalities shall be disposed of at the Monmouth County Reclamation Center Landfill and Shredder Facility, facility numbers 1336F and 1336D, located in Tinton Falls Borough, Monmouth County, New Jersey.
 
 
 156
 (o) Waste flows within, into and out of the Morris County District:
 
 
 157
 1. All solid waste types 10, 13, 23, 25, and 27 generated from within the Morris County municipalities of Chester Borough, Chester Township, Dover, Jefferson, Mendham Borough, Mendham Township, Mine Hill, Mount Arlington, Mount Olive, Netcong, Randolph, Rockaway Borough, Rockaway Township, Roxbury, Victory Gardens, Washington, and Wharton shall be directed to the Morris County Transfer Station, facility number 1427F, located in Mount Olive Township, Morris County, New Jersey, prior to disposal at permitted out-of-State facilities in accordance with the laws and regulations of the receiving state. (Effective January 2, 1988).
 
 
 158
 2. All solid waste types 10, 13, 23, 25, and 27 generated from within the Morris County municipalities of Boonton Borough, Boonton Township, Butler, Chatham Borough, Chatham Township, Denville, East Hanover, Florham Park, Hanover, Harding, Kinnelon, Lincoln Park, Madison, Montville, Morris Plains, Morris Township, Morristown, Mountain Lakes, Parsippany-Troy Hills, Passaic, Pequannock, and Riverdale shall be directed to the Morris County Transfer Station, facility number 1429J, located in Parsippany-Troy Hills Township, Morris County, New Jersey, prior to disposal at permitted out-of-State facilities in accordance with the laws and regulations of the receiving state. (Effective January 2, 1988).
 
 
 159
 (p) Waste flows within, into and out of the Ocean County District:
 
 
 160
 1. All solid waste types 10, 13, 23, 25, and 27 generated from within all Ocean County municipalities shall be disposed of at the Ocean County Landfill Corporation landfill, facility number 1518B, located in Manchester Township, Ocean County, New Jersey.
 
 
 161
 (q) Waste flows within, into and out of the Passaic County District:
 
 
 162
 1. All solid waste types 10 (except medical wastes), 13 (except large bulky wastes including such items as cable larger than six feet, foam insulation, tires, etc.), 23 (except leaves), 25, and 27 (except dry industrial waste such as plastics, rags, bulk powders, and containers with tar and paint residues, etc.) generated from within the Passaic County municipalities of Haledon, Hawthorne, North Haledon, Passaic City, Prospect Park, and Paterson shall be directed to the Pen Pac, Inc., Fulton Street Transfer Station, facility number 1608H, located in the City of Paterson, Passaic County, New Jersey. Waste received at this facility will be transported to permitted out-of-State disposal facilities in accordance with the laws and regulations of the receiving state. (Effective January 23, 1989).
 
 
 163
 2. Upon issuance of all required departmental permits, all solid waste types 10 (except medical wastes), 13 (except large bulky wastes including such items as cable larger than six feet, foam insulation, tires, etc.), 23 (except leaves), 25, and 27 (except dry industrial waste such as plastics, rags, bulk powders, and containers with tar and paint residues, etc.) generated from within the Passaic County municipalities of Bloomingdale, Clifton, Little Falls, Pompton Lakes, Ringwood, Totowa, Wanaque, Wayne, West Milford, and West Paterson shall be directed to the Pen Pac, Inc., Totowa Transfer Station, facility number 1612B, located in Totowa Borough, Passaic County, New Jersey. Waste received at this facility will be transported to permitted out-of-State disposal facilities in accordance with the laws and regulations of the receiving state.
 
 
 164
 3. Only solid waste types 10, 13, and 27, which are prohibited from the Fulton Street and Totowa Transfer Stations as indicated in (q)1 and 2 above, generated from all Passaic County municipalities shall be directed to Pen Pac, Inc., Iowa Avenue Transfer Station, facility number 1608A, located in the City of Paterson, Passaic County, New Jersey. Waste received at this facility will be transported to permitted out-of-State disposal facilities in accordance with the laws and regulations of the receiving state.
 
 
 165
 (r) Waste flows within, into and out of the Salem County District:
 
 
 166
 1. All waste types 10, 13, 23, 25 and 27 generated from within the Salem County municipalities of Alloway, Carney's Point, Elmer, Elsinboro, Lower Alloways Creek, Mannington, Oldmans, Pennsville, Penns Grove, Pilesgrove, Pittsgrove, Quinton, Salem City, Upper Pittsgrove and Woodstown, shall be disposed of at the Salem County regional landfill, facility number 1701B, located in Alloway Township, Salem County, New Jersey.
 
 
 167
 (s) Waste flows from within, into and out of the Somerset County District:
 
 
 168
 1. All nonputrescible, recyclable (commercial and institutional) waste type 10 and all waste type 27 generated from within the Somerset County municipalities of Bound Brook, Franklin, Manville, Millstone, Montgomery, Raritan, Rocky Hill, Somerville, and South Bound Brook, shall be directed to the Somerset Intermediate Recycling Center Transfer Station, facility number 1808K, located in Franklin Township, Somerset County, New Jersey, prior to disposal at permitted out-of-State facilities in accordance with the laws and regulations of the receiving state. (Effective January 2, 1988).
 
 
 169
 2. All solid waste types 10, 13, 23, 25, and 27 generated from within the Somerset County municipalities of Bedminster, Bernards, Bernardsville, Branchburg, Bridgewater, Far Hills, Green Brook, Hillsborough, North Plainfield, Peapack-Gladstone, Warren, and Watchung, and all solid waste types 10, 13, 23, and 25 generated from within the Somerset County municipalities of Bound Brook, Franklin, Manville, Millstone, Montgomery, Raritan, Rocky Hill, Somerville, and South Bound Brook not directed to the Somerset Intermediate Recycling Center Transfer Station, shall be directed to the Bridgewater Resources, Inc. Transfer Station, facility number 1806A, located in Bridgewater Township, Somerset County, New Jersey, prior to disposal at permitted out-of-State [sic] facilities in accordance with the laws and regulations of the receiving state or pursuant to (s)3 below. (Effective January 2, 1988).
 
 
 170
 3. Up to 1,400 tons per week of processible solid waste generated within Somerset County shall be transported from the Bridgewater Resources, Inc. Transfer Station to the Warren County Resource Recovery Facility, facility number 2117A, located in Oxford Township, Warren County, New Jersey, through the year 2001. (Effective June 30, 1989). From January 1, 2002 through November 30, 2008, Somerset County shall increase the processible waste it directs to the Warren County Resource Recovery Facility to 1,977 tons per week.
 
 
 171
 (t) Waste flows within, into and out of the Sussex County District:
 
 
 172
 1. All solid waste types 10, 13 and 23 generated from within the Sussex County municipality of Hopatcong shall be disposed of at Hopatcong Sanitary Landfill, facility number 1912A, located in Hopatcong Borough, Sussex County, New Jersey.
 
 
 173
 i. Upon closure of this facility, all solid waste types 10, 13 and 23 generated from the Sussex County municipality of Hopatcong Borough shall be disposed of at the new Sussex County Landfill, facility number 1913C, located in Lafayette Township, Sussex County, New Jersey.
 
 
 174
 ii. All solid waste types 25 and 27 generated from within the Sussex County municipality of Hopatcong Borough shall be disposed of at the Sussex County Landfill, facility number 1913C located in Lafayette Township, Sussex County, upon commencement of operations. Prior to commencement of landfill operations, waste shall be disposed of at the Sussex County Transfer Station, facility number 1913D.
 
 
 175
 2. All solid waste types 10, 13, 23, 25 and 27 generated from within the Sussex County municipalities of Andover Borough, Andover Township, Branchville, Byram, Frankford, Franklin, Fredon, Green, Hamburg, Hampton, Hardyston, Lafayette, Montague, Newton, Ogdensburg, Sandyston, Sparta, Stanhope, Stillwater, Sussex, Vernon, Walpack and Wantage shall be disposed of at the Sussex County Landfill, facility number 1913C, located in Lafayette Township, Sussex County, New Jersey, upon commencement of operations. Prior to the commencement of landfill operations, waste shall be disposed of at the Sussex County Transfer Station, Facility Number 1913D.
 
 
 176
 (u) Waste flows within, into and out of the Union County District:
 
 
 177
 1. All solid waste type 10 collected by municipal vehicles and generated from within the Union County municipalities of Summit and New Providence shall be directed to the Summit Transfer Station, facility number 2018A, located in Summit, Union County, New Jersey, prior to disposal at permitted out-of-State facilities in accordance with the laws and regulations of the receiving state. (Effective January 2, 1988).
 
 
 178
 2. All solid waste types 10, 13, and 23 generated from within the Union County municipality of Linden and collected by municipal vehicles shall be disposed of at the Linden Landfill, facility number 2009A, located in Linden, Union County, New Jersey. (Effective January 2, 1988).
 
 
 179
 3. All solid waste types 10, 13, and 23 formerly delivered by private citizens to the Elizabeth Public Works Convenience Center and all solid waste types 10, 13, and 23 generated from within the Union County municipalities of Elizabeth, Hillside, Roselle, Roselle Park, and Union Township and collected by municipal vehicles or White Brothers Trucking, and all solid waste types 10 and 13 generated by hospitals from within these same Union County municipalities shall be directed to the Ellesor Transfer Station, facility number 2004D, located in Elizabeth, Union County, New Jersey, prior to disposal at permitted out-of-State facilities in accordance with the laws and regulations of the receiving state. (Effective January 2, 1988).
 
 
 180
 4. All solid waste types 10, 13, 23, 25, and 27 generated from within the Union County municipalities of Berkeley Heights, Clark, Cranford, Fanwood, Garwood, Kenilworth, Mountainside, Plainfield, Rahway, Scotch Plains, Springfield, Westfield, and Winfield; all solid waste type 10 generated within the Union County municipalities of New Providence and Summit not directed to the Summit Transfer Station pursuant to (u)1 above; all solid waste type[s] 13, 23, 25, and 27 generated from within the Union County municipalities of New Providence and Summit; all solid waste types 10, 13, and 23 generated from within the Union County municipalities of Elizabeth, Hillside, Roselle, Roselle Park, and Union Township not directed to the Ellesor Transfer Station pursuant to (u)3 above; all solid waste types 25 and 27 generated from within the Union County municipalities of Elizabeth, Hillside, Roselle, Roselle Park, Union Township and Linden; and all solid waste types 10, 13 and 23 generated within the Union County municipality of Linden not directed to the Linden Landfill pursuant to (u)2 above, shall be directed to the Automated Modular Systems Transfer Station, facility number 2009I, located in Linden, Union County, New Jersey, prior to disposal at permitted out-of-State facilities in accordance with the laws and regulations of the receiving state. (Effective January 2, 1988).
 
 
 181
 5. For the purposes of this rule for Union County, municipal vehicles shall constitute collection vehicles owned or operated by a municipality, or collection vehicles owned or operated by a private entity which operates pursuant to a municipal contract.
 
 
 182
 6. When the Union County resource recovery facility, facility number 2013C, located in Rahway City, Union County, becomes operational, processible [sic] nonrecyclable [sic] solid wastes generated from all Union County municipalities shall be redirected to the energy recovery facility. Ash from the resource recovery facility and all bypass and nonprocessible waste shall be disposed of at the Empire Landfill located in Lackawanna County, Pennsylvania, in accordance with the laws and regulations of the receiving state.
 
 
 183
 (v) Waste flows within, into and out of the Warren County District:
 
 
 184
 1. All processible portions of solid waste types 10, 23, and 27 generated from within all Warren County municipalities shall be disposed of at the Warren County Resource Recovery Facility, facility number 2117A, located in Oxford Township, Warren County, New Jersey. (Effective June 1, 1988).
 
 
 185
 2. All nonprocessible, nonrecyclable portions of solid waste types 10, 23, and 27, all solid waste types 13 and 25 generated from within all Warren County municipalities, and all ash, bypass and nonprocessible waste from the Warren County Resource Recovery Facility shall be disposed of at the Warren County Landfill, facility 2123D, located in White Township, Warren County, New Jersey. (Effective June 1, 1988).
 
 
 186
 3. Up to 100 tons per day of processible solid waste generated from within Hunterdon County shall be transported from the Hunterdon County Transfer Station, facility number 1006B, located in Clinton Township, Hunterdon County, New Jersey, to the Warren County Resource Recovery Facility through the year 2001. (Effective June 1, 1988).
 
 
 187
 4. Up to 1,400 tons per week of processible solid waste generated from within Somerset County shall be transported from the Bridgewater Resources Transfer Station, facility number 1806A, located in Bridgewater Township, Somerset County, New Jersey, to the Warren County Resource Recovery Facility through the year 2001. (Effective June 30, 1989). From January 1, 2002 through November 30, 2008, Somerset County shall increase the processible waste it directs to the Warren County Resource Recovery Facility to 1,977 tons per week.
 
 
 188
 (w) The dates set forth in parentheses in the preceding subsections indicate when the emergency redirection orders originally implementing the subsections provisions became effective.
 
 
 189
 (x) If any section, subsection, provision, clause, or portion of this subchapter, or the application thereof to any person, is adjudged unconstitutional or invalid by a court of competent jurisdiction, such judgment shall be confined in its operation to the subchapter, section, subsection, provision, clause, portion, or application directly involved in the controversy in which such judgment shall have been rendered and it shall not affect or impair the remainder of this chapter or the application thereof to other persons.
 
 
 
 [1]
 The Commerce Clause grants Congress the power "[t]o regulate Commerce ... among the several states." U.S. Const. Art. I, § 8, cl. 3. In addition to this affirmative power, the Commerce Clause also has a "negative" or "dormant" component, under which states may not erect barriers to interstate trade. See Lewis v. BT Investment Managers, Inc., 447 U.S. 27, 35, 100 S.Ct. 2009, 2015, 64 L.Ed.2d 702 (1980). The dormant Commerce Clause applies whenever Congress "has not affirmatively acted to either authorize or forbid the challenged state activity." Norfolk Southern Corp. v. Oberly, 822 F.2d 388, 392 (3d Cir.1987). The defendants in this case do not argue that Congress has authorized the discrimination against interstate commerce present in the New Jersey solid waste control laws
 
 
 [2]
 The plaintiffs, who brought this action challenging the continued enforcement of New Jersey's flow control laws, are Atlantic Coast Demolition & Recycling, Inc., an out-of-state facility that processes construction and demolition debris, C & A Carbone, Inc., an out-of-state facility that processes all types of solid waste, the Waste Management Association of New Jersey and the National Solid Wastes Management Association. The latter two plaintiffs are, for the most part, small, privately held businesses engaged in the collection and disposal of solid waste in New Jersey and surrounding states. We refer to C & A Carbone and the two Association plaintiffs collectively as "Carbone plaintiffs."
 The defendants are the New Jersey Department of Environmental Protection (NJDEP), the Bergen County Utilities Authority, the Hudson County Improvement Authority, the Passaic County Utilities Authority, the Mercer County Improvement Authority, the Essex County Utilities Authority, and the Cape May County Municipal Utilities Authority. With the exception of the Bergen County Utilities Authority, which has filed a separate brief, we refer collectively to the county authorities as "County Authority defendants."
 
 
 [3]
 For a discussion of the trials and tribulations of New Jersey waste authorities that have contracted with out-of-state facilities, see Waste Management of Pennsylvania, Inc. v. Shinn, 938 F.Supp. 1243 (D.N.J.1996)
 
 
 [4]
 Of the twenty-two districts, five districts exercise direct control, eleven districts delegate responsibility to utility authorities, four delegate responsibility to improvement authorities, and two delegate responsibility to pollution control financing authorities. Atlantic Coast II, 931 F.Supp. at 347
 
 
 [5]
 "Tipping fees" are the fees charged per ton of waste disposed with the facility
 
 
 [6]
 The district court cites estimates that those who generate waste within the State "spend an average of $110 million per year in excess tipping fees, compared to competitive market prices, due to flow control." Atlantic Coast II, 931 F.Supp. at 349 p 17
 
 
 [7]
 Cf. Harvey & Harvey, Inc. v. County of Chester, 68 F.3d 788, 801 (3d Cir.1995) (explaining that to determine whether flow control schemes discriminate against interstate commerce, court must examine the designation process, the duration of the designation, and the likelihood of adding alternative sites for indications that out-of-state bidders do not enjoy equal access to the local market)
 
 
 [8]
 In addition, waste disposal facilities designated as proper receptors of a particular district's waste may seek injunctive relief in state courts to prevent unauthorized diversion of waste to unauthorized facilities. See Morris Cty. Transfer Station, Inc. v. Frank's Sanitation Service, Inc., 260 N.J.Super. 570, 617 A.2d 291 (App.Div.1992)
 
 
 [9]
 Atlantic Coast processes "mixed waste," such as construction and demolition debris, which contain both recyclable and non-recyclable materials. Unlike solid waste, recyclable materials may be deposited with any licensed facility, regardless of whether it has been designated and approved in a particular district's waste disposal plan. See N.J.S.A. § 48:13A-4; N.J.A.C. § 7:26-1.1(a)(1). Under New Jersey's solid waste disposal regulatory system, undesignated facilities may accept mixed waste, provided the facilities: (1) return the non-recyclable waste to the in-state disposal facilities once the mixed waste has been sorted; or (2) pay the tipping fees that would otherwise be charged for disposal of the non-recyclable waste. N.J.A.C. §§ 7:26-6.9, 26-2B.9
 
 
 [10]
 See note 2, supra
 
 
 [11]
 The Carbone plaintiffs also were initially joined by "municipal plaintiffs" including the mayors of Jersey City and Northvale. The district court dismissed these plaintiffs from the case on June 9, 1995. See Atlantic Coast, 893 F.Supp. 301. (D.N.J.1995)
 In addition to NJDEP, Carbone sued the Bergen County Utility Authority, which has submitted its own brief as an appellee.
 
 
 [12]
 C & D waste constitutes approximately 12 % by weight of the waste generated by New Jersey. See Carbone Br., at 9
 
 
 [13]
 With regard to Atlantic Coast's motion, the district court provided:
 The Court shall give the state sixty days to submit a proposed alternative, non-discriminatory plan to the current waste flow regulations governing the flow of the type of waste within Atlantic Coast's ... permit, along with a study of the possible impact of the proposed system on the state and the public. Thirty days thereafter the remaining defendants may submit a study of the possible impact of the proposed alternative regime on them. Thirty days after that Atlantic Coast may submit its objections, if any, to the state's proposed plan, and any arguments in opposition to the defendants' impact studies. The Court will then consider these submissions and fashion appropriate relief.
 Atlantic Coast, 893 F.Supp. at 312. Following the allotted period of time, the district court concluded that the state defendants could not establish that a preliminary injunction would cause them irreparable harm, and instituted an injunction eliminating all flow control of mixed loads of C & D waste. See Atlantic Coast Demolition & Recycling, Inc. v. Board of Chosen Freeholders of Atlantic Cty., 909 F.Supp. 229 (D.N.J.1995).
 
 
 [14]
 Although the Waste Management case has been appealed to this Circuit, the appeal has been stayed pending our decision in this case
 
 
 [15]
 This test is described as "rigorous scrutiny," see Carbone, 511 U.S. at 392, 114 S.Ct. at 1683; "more demanding scrutiny," see Maine, 477 U.S. at 138, 106 S.Ct. at 2447; "strict scrutiny," see Harvey, 68 F.3d at 803; and "heightened scrutiny," see Atlantic Coast I, 48 F.3d at 713. Despite the various designations, the test is the same
 
 
 [16]
 We emphasize that the heightened scrutiny test imposes a heavy burden on the state's discriminatory waste control regime. The State and County Authority defendants contend that even under heightened scrutiny the current waste-management system must be upheld unless the proposed alternatives would be equally effective in meeting the state's legitimate goals. According to their understanding of Maine, a challenged statue or regulatory measure will withstand the challenge as long as the State can show that a legitimate local purpose cannot "be served as well by available nondiscriminatory means."
 We reject this reading of Maine. As we have noted, see II.A., supra, in Carbone, the Supreme Court explained that discrimination against interstate commerce "is per se invalid, save in a narrow class of cases in which the municipality can demonstrate, under rigorous scrutiny, that it has no other means to advance a legitimate local interest." Carbone, 511 U.S. at 392, 114 S.Ct. at 1683, citing Maine, 477 U.S. 131, 106 S.Ct. 2440, 91 L.Ed.2d 110 (1986). To accept the State's interpretation of heightened scrutiny in Maine would be to lessen the standard of proof and to ignore that it is the State that must supply "the clearest showing that the unobstructed flow of interstate commerce itself is unable to solve the local problem." Id.
 
 
 [17]
 Our disposition of this case does not for example affect Section 48:13A-9(b) of the SWUCA, which enables the State to suspend a corporation's certificate to collect waste in New Jersey if its violates "any provision of any laws related to pollution of the air, water or lands" of the State. See N.J.S.A. § 48:13A-9(b)
 
 
 [18]
 Since the viability of other waste disposal schemes is a factual matter, the district court's conclusion is reversible only if this Court finds clear error. See Fabulous Associates, 896 F.2d at 783
 
 
 [19]
 We must note that the defendants' reliance argument is rather weak, in light of the Supreme Court's opinion in Carbone I, which was issued nearly three years ago in 1994. The district court noted that bond rating agencies have downgraded the ratings of outstanding issues of several local authorities "due to the uncertainty of the fiscal integrity of those authorities as a result of the issuance of the Carbone I decision on May 16, 1994 and the Atlantic Coast [I] decision in February of 1995." Atlantic Coast II, 931 F.Supp. at 348-49. Thus, the defendants clearly had some warning that we might reverse the stance we had taken in Filiberto
 
 
 [20]
 See Appendix, infra. Of course, the injunction does not apply to those limited portions of N.J.A.C. § 7:26-6.5 that permit the disposal of particular types of waste with out-of-state facilities. See e.g. N.J.A.C. § 7:26-6.5(b)(1)(i); N.J.A.C. § 7:26-6.5(d)(2)(i); N.J.A.C. § 7:26-6.5(u)(6)
 
 
 [21]
 No regulations currently govern the traffic routes for trash disposal in New Jersey. Although the SWMA requires the county authorities to provide a survey of transportation routes pursuant to N.J.S.A. § 13:1E-21(b)(4), the county authorities ultimately retain the discretion to prescribe particular routes for transportation
 
 
 [22]
 The district court issued its two-year post-appeal stay without developing a record. This alone compels us to vacate the stay as an abuse of discretion. We will not, however, remand on this issue because as we demonstrate infra, the defendants simply cannot prove any harm other than adverse financial impact, which by itself, cannot support the district court's extraordinary action
 
 
 [23]
 Neither the plaintiffs nor this Court question the district court's authority to issue a stay pending the defendant's appeal of this case. Although a stay-pending-appeal effectively prevents a prevailing party from exercising protected activity, it is substantively different from a post-appeal stay
 The purpose of a stay-pending-appeal is to relieve the losing party of the burden of changing his behavior unnecessarily. When a lower court issues a stay pending appeal, it recognizes the possibility that its ruling on the merits may be incorrect. If indeed the lower court's determination is incorrect, it may force a losing party to expend substantial and unrecoverable amounts of money for no reason at all. Consistent with this purpose, one of the factors courts consider when they grant stays pending appellate review is whether the applicant for such relief has shown that he is likely to succeed on the merits. See Hilton v. Braunskill, 481 U.S. 770, 776, 107 S.Ct. 2113, 2119, 95 L.Ed.2d 724 (1987). Thus, a stay-pending-appeal has nothing to do with the losing party's reliance on "old" law; on the contrary, it is issued on the assumption that the "new" law is not yet law at all.
 
 
 [24]
 See, e.g., Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 and 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955)
 
 
 [25]
 See, e.g., Hutto v. Finney, 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978)
 
 
 [26]
 This provision states in pertinent part:
 "Upon a determination by the Department that an emergency condition ... requires the redirection of waste flows, the Department may order such redirection." N.J.A.C. § 7:26-6.7(a).
 
 
 [27]
 The state of Florida could also have remedied the situation by charging local liquor producers at the higher rates that it had already charged out-of-state firms. See McKesson, 496 U.S. at 39-40, 110 S.Ct. at 2252
 
 
 [28]
 We do not find dispositive the fact that the Florida Supreme Court in McKesson withheld relief, while the district court in this case simply delayed its relief for two years. Either way, the plaintiffs are forced to suffer the results that accrue from the enforcement of a law that concededly violates the Commerce Clause. Nor have we found any case, involving solely the financial impact of rectifying a constitutional violation, where a delay in remedy is permitted on that ground alone
 
 
 [29]
 Chevron Oil listed three factors for a court's consideration: first, whether the decision to be applied established a "new principle of law"; second, whether application of the new rule retroactively would "further or retard its application"; and third, whether the decision would create "inequitable results" if applied retroactively to the parties before the court. Chevron Oil, 404 U.S. at 106-107, 92 S.Ct. at 355
 
 
 [30]
 Judge Roth would point out that Hyde itself suggests that reliance interests, by themselves, may not support a court's withholding of remedial relief. "If Harper has anything more than symbolic significance, how could virtually identical reliance, without more, prove sufficient to permit a virtually identical denial [of relief ] because it is characterized as a denial based on 'remedy' rather than 'non-retroactivity'?" Hyde, 514 U.S. at 754, 115 S.Ct. at 1749 (criticizing argument that reliance interests may support withholding of remedial relief)
 
 
 [31]
 We do note, however, that the Supreme Court's latest retroactivity decisions remain relevant to our analysis of the district court's stay insofar as they demonstrate that financial expense, by itself, cannot serve as a reason for denying constitutional relief
 
 
 [32]
 The clerk is directed to enter our order and injunction as follows:
 IT IS HEREBY ORDERED AND DECREED:
 
 
 [1]
 Final judgment is hereby entered in favor of plaintiffs and against defendants, declaring that New Jersey's waste flow control regulations are unconstitutional insofar as they discriminate against out-of-state operators of waste-disposal facilities
 
 
 [2]
 The defendants, their agents, servants, employees, designees, and assigns, are enjoined from enforcing those provisions of New Jersey Administrative Code § 7:26-6.5 which, by designating in-state facilities as the sole providers of disposal and processing services, discriminate against out-of-state operators of waste-disposal facilities. This injunction shall not apply to those limited portions of N.J.A.C. § 7:26-6.5 that permit the disposal of particular types of waste with out-of-state facilities. See, e.g., N.J.A.C. §§ 7:26-6.5(b)(1)(i), 6.5(d)(2)(i), 6.5(u)(6)
 
 
 [3]
 Insofar as the defendants must select and contract with waste disposal facilities pursuant to N.J.A.C. §§ 7:26-6.6 and 6.7 in order to comply with the provisions of this injunction, they are permanently enjoined from implementing New Jersey's self-sufficiency policy as mandated under the State Plan by abrogating existing valid contracts or rejecting or foreshortening contracts submitted to the New Jersey Department of Environmental Protection for review
 
 
 [4]
 This injunction does not bar the enforcement of the remaining portions of either the Solid Waste Utility Control Act, N.J.S.A. §§ 48:13A-1 et seq., or the Solid Waste Management Act, N.J.S.A. §§ 13:1E-1 et seq
 
 
 [5]
 The district court's two-year post-appeal stay is reversed
 
 
 [6]
 This injunction will be stayed, and become effective only, upon the exhaustion or passage of time for all appeals, or denial of petitions for certiorari by the Supreme Court of the United States, or by the United States Supreme Court's final decision in this case affirming this court's judgment
 
 
 [7]
 As so modified, the judgment of the district court will be affirmed